20 N.J. Super. 383 (1952)
90 A.2d 72
REGINA CAROLINE CLEMENS, PLAINTIFF-RESPONDENT,
v.
FRED JAMES CLEMENS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 2, 1952.
Decided June 11, 1952.
*385 Before Judges McGEEHAN, JAYNE and GOLDMANN.
Mr. James T. Kirk argued the cause for respondent.
Mr. Irving Siegler argued the cause for appellant (Messrs. Siegler & Siegler, attorneys).
The opinion of the court was delivered by GOLDMANN, J.A.D.
This appeal challenges the award of the custody of the infant child of the marriage to the mother.
Regina Caroline Clemens filed a bill for separate maintenance against her husband, Fred James Clemens, in the former Court of Chancery on July 21, 1948, praying support and maintenance for herself and their child Carol, then six years old. Defendant's answer denied abandonment of his wife or refusal and neglect to maintain and provide for her and Carol, and stated that he had been paying $10 a week for the support of the child pursuant to an order of the Passaic County Criminal Judicial District Court. Defendant counterclaimed for custody of Carol.
On August 4, 1950, the husband instituted an action for divorce on the ground of simple desertion, alleged to have commenced January 7, 1948. He demanded judgment dissolving the marriage and awarding him custody of the child. The wife filed no answer.
The two actions were consolidated by order advised September 26, 1950. Hearings were held April 4, May 17 and *386 May 21, 1951, and resulted in the entry of a single judgment exhibiting a double aspect: (1) a judgment dismissing the complaint and counterclaim in the wife's separate maintenance action and allowing her a counsel fee of $300, and (2) a judgment nisi in the husband's divorce action, awarding custody of the child to the mother, with such reasonable visitation and partial custody in the father as might be agreed to by the parties.
The husband appeals from the award of custody and the allowance of counsel fee. The latter issue was abandoned at the argument.
The appeal invites a review of the facts presented in the course of the extended hearing before the advisory master. This court may make new or amended findings of fact, but the rule enjoins that in so doing due regard be given to the opportunity of the advisory master to judge of the credibility of the witnesses. Rules 1:2-20, 4:2-6.
The conclusions of the advisory master summarize the testimony in considerable detail but give no clue to the reasons which led him to decide that "the welfare and happiness of the child of the marriage, a girl, aged nine years, can best be served by retaining custody in the mother subject to defendant's visitation rights and partial custody as may be agreed to by the parties." The advisory master does not comment upon the credibility of the several witnesses or indicate the weight which he assigned to their respective testimonies. Nor does he crystallize the evidence into findings which would provide guidance in the determination of this appeal. In the circumstances, we have concluded that it is essential that we review the evidence and develop our own independent findings. Lehmann v. Lehmann, 7 N.J. Super. 232 (App. Div. 1950).
Mrs. Clemens left her husband on January 7, 1948, taking her child with her to Elizabeth, N.J., where she lived with a sister for some six months. In the summer of 1948 she was obliged to move to quarters of her own  second floor rooms in a run-down, ramshackle, vermin-infested tenement on *387 Dickinson Street, Elizabeth. The rooms were poorly lit and badly in need of painting. There was a table and one chair; crates and boxes served as the other furniture. The child slept on a folding cot, and the mother and her sister slept on a mattress on the floor. Some months later all three moved into their present quarters, a second-floor apartment on Elizabeth Avenue, a business street in Elizabeth. Mrs. Clemens furnished this apartment in modestly comfortable fashion with new and second-hand furniture. The child sleeps in a windowless room which was described as a closet-like space. In the rear of the premises is a small parking lot which Carol sometimes uses as a playground.
It is appropriate to describe briefly the Clemens home where Carol and her mother once lived. It is a well-furnished 12-year-old house at Pinecliff Lake, West Milford, N.J., purchased by the father in 1946. There are seven rooms and two sun-porches, a front lawn and a back yard planted with flowers and shrubbery. The back yard leads directly onto Pinecliff Lake which the child used for swimming, boating and fishing. There is a playground three or four doors away, with a supervised public beach. The child had her own room in this home, which she uses when she visits her father on the weekend. The room has two windows, one leading to a back porch. There is bus service to a parochial school two miles away, and there is a Catholic church a mile away.
Mrs. Clemens and her sister both work during the day. After being given breakfast by her mother, Carol and her twin cousins, who live in the apartment above, go to parochial school. They sometimes take her to lunch and sometimes she buys her food at the school cafeteria. After school Carol attends a playground sewing school on Tuesdays and a dancing school at the same place on Wednesdays. Sometimes she goes shopping with her mother on Thursdays. On Mondays and Fridays she stays home and plays in front of the house or in the parking lot in back. Her mother prepares supper when she returns from work.
*388 The testimony is in conflict as to the care which the mother gives the child. Mr. Clemens and his 55-year-old mother, who lives with him, testified that when the child comes on her weekly visits her hair is knotted and looks as if it were not combed regularly, the child has a strong body odor and needs a bath, her teeth have not been brushed, her clothes are dirty, her stockings torn and her shoes too tight. The child has not yet broken her bed-wetting habit and her legs are chafed as a result. The testimony of Mrs. Clemens and her sister would indicate that Carol receives good care. The child herself testified that her mother combs her hair every day, there is a daily change of underwear and socks, and she wears her dress until it gets dirty. However, she is bathed only once a week.
In February, 1949, about one year after Mrs. Clemens left her husband, she met one Louis Marek at a dance. She testified that he began coming to the Dickinson Street house in May, 1949, his visits numbering two or three a week. Her sister testified that he came four times a week and sometimes had his evening meal with them. He moved a bureau into the apartment and also installed a new television set. Although Mrs. Clemens testified that she and Marek stopped seeing each other in January, 1950, Marek testified that he saw her for a year and a half. He was in love with her, but doesn't know if she was in love with him. The two of them went out to taverns, and they visited the movies once a week. Mrs. Clemens testified that the relationship was one of friendship. However, Marek testified that he embraced and kissed her openly, but not in the presence of the child.
An investigator hired by the husband had the couple under surveillance on some 15 occasions. His testimony reveals that their relation was much more intimate than either would indicate. Marek freely came and went from the Dickinson Street, and later the Elizabeth Avenue premises. The two walked arm-in-arm on the street, holding hands, and on one occasion Marek sat in a nearby park with his arms around *389 Mrs. Clemens. They would go out evenings and return to the apartment in the early hours of morning. On one occasion Marek was still in the apartment when the investigator quit his post at 4:30 A.M.
Mr. Clemens told of an occasion when he brought Carol home after a weekend visit and found Marek in the doorway of the apartment with only a towel around him. Another time he saw him through a window, getting dressed.
The child testified that Marek used to come to the house, but his visits stopped after he took his television set away. Marek took care of her when her mother was at work. He sometimes took her mother out. Later "Uncle Louie" (Moschini) came to the house often, and sometimes he had his meal there. After supper her mother would lie down for a while, and when Moschini was there he would lie down with her. When Carol was sick, she would sometimes stay home alone, sometimes her mother would stay with her and sometimes "Uncle Louie" would come to take care of her.
Mrs. Clemens stated that Moschini began to come to the Elizabeth Avenue house in October, 1950, visiting there three or four times a week. She admitted that he had brought her home as late as 2:30 A.M., but didn't stay. Both she and Moschini denied that he ever lay down in bed with her. He admitted he was in love with her, but how she felt about the relationship was something between them.
Moschini's visits to the Elizabeth Avenue apartment continued during the period of the hearings. The child testified that when her father brought her home on the Saturday before the second day of the hearing, Moschini lay on the couch with her mother for a little while.
The Superior Court, as successor to the former Court of Chancery, has authority under its general equity powers to deal with the custody of infants. This inherent jurisdiction exists pari passu with, and is not dependent upon, statutory grants (In re Erving, 109 N.J. Eq. 294, 297 (Ch. 1931)), and is more extensive than the grants conferred upon the *390 court by statute. Hachez v. Hachez, 124 N.J. Eq. 442, 446 (E. & A. 1938).
The Legislature has, together with the authority to grant divorces, conferred upon the Superior Court the power to make orders "touching the care, custody, education and maintenance of the children [of the marriage], or any of them, as the circumstances of the parties and the nature of the case shall render fit, reasonable and just, * * *." N.J.S. 2A:34-23. This grant of express authority in divorce actions was not intended to restrict the general jurisdiction of the court over the custody of infants. The inherent jurisdiction of the court may be, and has been, invoked in matrimonial actions. See Cole v. Cole, 89 N.J. Eq. 381, 382 (Ch. 1918); 10 N.J. Practice (Herr, Marriage, Divorce and Separation) § 513, p. 526. The custody award in a judgment of divorce may be made under N.J.S. 2A:34-23 or under the general jurisdiction of the court.
At common law the father was the guardian by nature of his legitimate, minor children and as such was entitled to their custody. State v. Stigall, 22 N.J.L. 286, 288 (Sup. Ct. 1849), and see Lippincott v. Lippincott, 97 N.J. Eq. 517, 519-520 (E. & A. 1925). It was early held that the Legislature may alter this common law right; the father's right is not a contract right or a property right in the child. Bennet v. Bennet, 13 N.J. Eq. 114, 118 (Ch. 1860). "* * * a child cannot be lawfully regarded as a mere inanimate chattel which must be restored to the lawful owner in all circumstances. Like the parent, the child has rights, and the strict legal rights of a father, as such, can only be enforced in this court with proper regard to the best interests of the child." Kopcinski v. Richardson, 94 A. 32, 33 (Ch. 1915).
As between natural parents, the common law right of the father to the custody of a child has been subordinated in equity to the welfare of the child, irrespective of statutory modifications. English v. English, 32 N.J. Eq. 738 (E. & A. 1880). The first statute seems to be that of 1860 (L. *391 1860, p. 437), which provided that where husband and wife lived in a state of separation without being divorced, and the child was brought before the court on habeas corpus, the child, if under age of seven years, was to be delivered to the mother. Bennet v. Bennet, above. The common law right of the father to the custody of his children was further curtailed by a supplement to the Divorce Act, L. 1871, c. 48, § 6 (Rev. 1877, p. 319, § 27). It provided that in a controversy between parents they were, in the absence of misconduct, equally entitled to the custody of the children, the happiness and welfare of the children to be the determinant. This provision has since been transposed, with some modifications, to the statute relating to minors. N.J.S.A. 9:2-4 now provides:
"In making an order or judgment relative to the custody of the children pending a controversy between their parents, or in regard to their final possession, the rights of both parents, in the absence of misconduct, shall be held to be equal, and they shall be equally charged with their care, nurture, education and welfare, and the happiness and welfare of the children shall determine the custody or possession.
The court may make the necessary orders and judgments from time to time in relation to such custody or possession, but the father, as such, shall not have preference over the mother as to the award of custody of such minor child if the best interests of the child otherwise may be protected, * * *."
This statutory provision, giving each parent the equal right to custody in the absence of misconduct, has been held declaratory of the rule existing in Chancery prior to its passage. In English v. English, above, it was said (at page 743) that the 1871 act
"introduces no new rule; but it embodies a clear declaration of the legislative approval of that which the court had adopted. Under it, in controversies between parents for the custody of their children, there can exist no restraint upon the mind of the court, arising out of the superior rights of the father at common law, but all legitimate force must be accorded to those considerations which touch the well-being of the child."
*392 In matrimonial actions the statute relating to minors, N.J.S.A. 9:2-1 et seq., so far as applicable, may be considered as complementing the Divorce Act.
The parties here agree that in a contest between parents for the custody of an infant child, the happiness and welfare of the child is the determining factor, and each case must be determined upon its own particular facts and circumstances. The language of Justice Minturn in Lippincott v. Lippincott, 97 N.J. Eq. 517, 519 (E. & A. 1925) states the rule:
"Manifestly, the touchstone of our jurisprudence in matters dealing with the custody and control of infants, is the welfare and happiness of the infant, and not the filial affections naturally arising from parental or family relationship."
The present contest over custody centers upon the application of this long-established principle to the facts of the case.
In determining the delicate and often difficult judgment as to which parent shall have custody, the court will consider the personal safety, morals, health, general welfare and happiness of the child. The court will look at the character, condition, habits and other surroundings of the father and mother. Richards v. Collins, 45 N.J. Eq. 283, 287 (E. & A. 1889).
Although the home of the father at Pinecliff Lake is more attractive and comfortable, and obviously has almost every advantage over the modest living quarters of the mother, this fact alone cannot be the determinant in resolving the problem of custody. However, this relative difference in the homes of the litigants should have some weight in the decision. The child testified that she loves both her parents, but she would like to be at her father's home all the time. Her expressed choice is a circumstance which the court may take into consideration in disposing of her custody. Richards v. Collins, above, at page 288; Smith v. Smith, 17 N.J. Misc. 194, 198 (Ch. 1939), affirmed 125 N.J. Eq. 384 (E. & A. 1939). The court is not, of course, conclusively bound by the wishes of the infant. Giffin v. Gascoigne, 60 N.J. Eq. 256, 259 (Ch. 1900).
*393 But more important than this matter of the relative home comforts is the impact upon the child of the living conditions to which she has been subjected, particularly the conduct of her mother. Strangers have tended her in her illnesses, minor though the mother makes them out to be. Carol has been left at the apartment at night while the mother has gone out to taverns, dances and the movies, returning far past midnight. She has experienced and in her child-like way noted the questionable situation of men who made her mother's home their home, who came and went when they pleased and who occupied a place at the family table once filled by the father. Without, perhaps, being able to evaluate fully the significance of the repeated occurrences, she has seen one of these men lie down beside her mother. For all that appears, she might also have seen some of the embraces and kisses of Marek and Moschini.
To permit a continuation of the present custodial arrangement would be to disregard the personal welfare and morals of the child.
At Pinecliff Lake Carol will have the love and affection of her father and paternal grandmother, and the assurance of constant attention and guidance which spells security for a growing girl. There she will enjoy pleasant and comfortable surroundings and all the facilities necessary for her proper education and upbringing. She will be free of the dubious moral climate that has enveloped her for the past three years  free of it at a time when the young mind has not yet given significance to what it has experienced.
Custody was awarded to the mother without the benefit of an investigation by the county probation office into the character and fitness of the parties or any of the other factors so important in making a proper determination. Such investigation is now required in contested custody cases, and is discretionary with the court in other matrimonial actions involving custody. Rule 3:87-12, adopted January 1, 1952. The rule also leaves it in the discretion of the court making an award of custody to file a certified copy of its order or *394 judgment with the probation office of the county or counties where the child or children reside, with a direction therein to such probation office to make periodic reports to the court as to the status of the custody.
The judgment below is reversed and a new judgment should be entered awarding custody of the child to appellant and providing for reasonable visitation rights in the mother. A copy of the new judgment shall be filed with the probation offices of Passaic County, where the father lives, and of Union County, where the mother resides, for periodic investigations and reports as to the new custodial arrangement. These will respectively cover custody of the child while she is with the father and when she is on visits with her mother.