M. ARTHUR BECK, PLAINTIFF-APPELLANT, v. SUSAN M. BECK, DEFENDANT-RESPONDENT.

Argued January 13, 1981—Decided July 2, 1981.

---

484

*Howard Stern* argued the cause for plaintiff-appellant (*Stern, Steiger, Croland & Bornstein,* attorneys; *Howard Stern,* of counsel; *Myra T. Peterson,* on the briefs).

*Carol Eisenberg* argued the cause for defendant-respondent (*Rose, Poley & DeFuccio,* attorneys).

*James B. Boskey* and *Howard P. Danzig* submitted a brief on behalf of amicus curiae, Seton Hall Law School, Family Law Clinic.

The opinion of the Court was delivered by

CLIFFORD, J.

The parties to this matrimonial action have been granted joint legal and physical custody of their two adopted female children. Although neither party requested joint custody, the trial court nevertheless found such an arrangement to be in the best interests of the children.[1] On appeal by defendant-wife, the Appellate Division found in her favor, reversing and remanding the joint custody decree with directions to award sole custody to her as the children's mother and liberal visitation rights to their father, and to make an appropriate upward adjustment of child support. *Beck v. Beck,* 173 *N.J.Super.* 33 (1980). We granted

---

[1] In his pleadings plaintiff-husband sought only "liberal" visitation rights. He has since indicated a willingness to accept joint custody.

certification 84 *N.J.* 451 (1980), to review that determination because of the novel and important questions presented.

## I

■ The initial issue is whether courts are authorized to decree the joint custody of children. The pertinent statute provides courts with broad authorization for custody determinations in divorce proceedings:

> * * * [T]he court may make such order * * * as to the care, custody, education and maintenance of the children, or any of them, as the circumstances of the case shall render fit, reasonable and just * * *. [*N.J.S.A.* 2A:34–23.]

This provision evinces a legislative intent to grant courts wide latitude to fashion creative remedies in matrimonial custody cases. *Cf. Clemens v. Clemens,* 20 *N.J.Super.* 383, 389–90 (App. Div.1952) (Superior Court also has inherent jurisdiction over custody matters as successor to former Court of Chancery). The language of the statute is sufficiently broad to include the authority to decree joint custody. See *Mayer v. Mayer,* 150 *N.J.Super.* 556, 561 (Ch.Div.1977).

Moreover, parents involved in custody controversies have by statute been granted both equal rights and equal responsibilities regarding the care, nurture, education and welfare of their children. See *N.J.S.A.* 9:2–4. Although not an explicit authorization of joint custody, this clearly related statute indicates a legislative preference for custody decrees that allow both parents full and genuine involvement in the lives of their children following a divorce. This approach is consonant with the common law policy that "in promoting the child's welfare, the court should strain every effort to attain for the child the affection of both parents rather than one." *Turney v. Nooney,* 5 *N.J.Super.* 392, 397 (App.Div.1959). See also *Clemens, supra,* 20 *N.J.Super.* at 391 (*N.J.S.A.* 9:2–4 is merely declaratory of pre-existing common law rule). Hence, joint custody comports as well with the established policy of this state.

## II

The use by the courts of custodial arrangements other than sole custody is not new. In the early cases of many jurisdictions custody was routinely divided when both parents sought it. See Annot., 92 *A.L.R.2d* 695, 698 (1963). Shortly after the turn of the century, however, this practice began to be questioned. *Id.* Nevertheless, some courts have continued to fashion such remedies when deemed appropriate. See Bratt, *Joint Custody*, 67 *Ky.L.J.* 271, 282 n.45 (1979).

In recent years the concept of joint custody has become topical, due largely to the perceived inadequacies of sole custody awards and in recognition of the modern trend toward shared parenting in marriage. Sole custody tends both to isolate children from the noncustodial parent and to place heavy financial and emotional burdens on the sole caretaker, usually the mother, see Bratt, *supra*, 67 *Ky.L.J.* at 275; Miller, *Joint Custody*, 13 *Fam.L.W.* 345, 354–57 (1979), although awards of custody to the father, especially in households where both parents are employed outside the home, are more common now than in years past. Moreover, because of the absolute nature of sole custody determinations, in which one parent "wins" and the other "loses," the children are likely to become the subject of bitter custody contests and post-decree tension. *Id.* at 355. The upshot is that the best interests of the child are disserved by many aspects of sole custody.

Joint custody attempts to solve some of the problems of sole custody by providing the child with access to both parents and granting parents equal rights and responsibilities regarding their children. Properly analyzed, joint custody is comprised of two elements—legal custody and physical custody.[2] Under a

---

[2]Joint custody must be distinguished from "alternating" custody (an arrangement in which parents alternate both physical and legal custody) and "split" custody (in the case of two or more children, each parent is awarded sole custody of one or more of the children). See Folberg & Graham, *Joint*

joint custody arrangement legal custody—the legal authority and responsibility for making "major" decisions regarding the child's welfare—is shared at all times by both parents. Physical custody, the logistical arrangement whereby the parents share the companionship of the child and are responsible for "minor" day-to-day decisions, may be alternated in accordance with the needs of the parties and the children.

At the root of the joint custody arrangement is the assumption that children in a unified family setting develop attachments to both parents and the severance of either of these attachments is contrary to the child's best interest. See Bratt, *supra*, 67 *Ky.L.J.* at 296–97; Folberg & Graham, *Joint Custody of Children Following Divorce*, 12 *U.Calif.D.L.Rev.* 523, 535 (1970). Through its legal custody component joint custody seeks to maintain these attachments by permitting both parents to remain decision-makers in the lives of their children. Alternating physical custody enables the children to share with both parents the intimate day-to-day contact necessary to strengthen a true parent-child relationship. See Bratt, *supra*, 67 *Ky.L.J.* at 299–300; Greif, 49 *Am.J.Orthopsych.* 311, 315 (1979).

Joint custody, however, is not without its critics. The objections most frequently voiced include contentions that such an arrangement creates instability for children, causes loyalty conflicts, makes maintaining parental authority difficult, and aggravates the already stressful divorce situation by requiring interaction between hostile ex-spouses. See Miller, *supra*, 13 *Fam.L.W.* at 366–68; 2 Foster & Freed, *Law and the Family*, § 29.6A (Supp.1981). Although these same problems are already present in sole custody situations, see *Bratt, supra*, 67 *Ky.L.Rev.* at 305–06, some courts have used these objectives either to reject or strictly limit the use of joint custody.

---

*Custody of Children Following Divorce*, 12 *U.Calif.D.L.Rev.* 523, 525–30 (1979); Miller, *supra*, 13 *Fam.L.Rev.* at 360–61.

■ Because we are persuaded that joint custody is likely to foster the best interests of the child in the proper case, we endorse its use as an alternative to sole custody in matrimonial actions. We recognize, however, that such an arrangement will prove acceptable in only a limited class of cases, as set forth more particularly in part VII of this opinion. But despite our belief that joint custody will be the preferred disposition in some matrimonial actions, we decline to establish a presumption in its favor or in favor of any particular custody determination.[3] Our concern is that a presumption of this sort might serve as a disincentive for the meticulous fact-finding required in custody cases. See Folberg & Graham, *supra*, 12 *U.Calif.D.L.Rev.* at 577. Such fact-finding is particularly important in these cases because the very interplay of parents and children that gives joint custody its potential value also creates complications different from those found in sole custody arrangements. Some of those complications are dramatized by the instant case.

### III

The parties were married in July 1963. Their two daughters, Lauren, now age twelve, and Kirsten, now age ten, were adopted in infancy. Plaintiff-husband is a successful commercial photographer. Defendant-wife works as a part-time student teacher supervisor at a local college. Since February 14, 1976, when Mr. Beck left the marital residence, the girls have resided with their mother subject to periodic visitation by their father.

In September 1977 plaintiff-husband filed a complaint for divorce based on eighteen months separation. *N.J.S.A.* 2A:34–2(d). He sought liberal visitation rights but not custody of the

---

[3]We reject the notion that divorce dissolves the family as well as the marriage. *Contra, Braiman v. Braiman*, 44 *N.Y.2d* 584, 378 *N.E.2d* 1019, 1022, 407 *N.Y.S.2d* 449 (N.Y.1978). Both the legislation and case law of this state are designed to encourage parent-child interaction following divorce. *Supra* at 485. This policy is based on the best interests of the child and not on any notion of parental rights.

children. Defendant answered and counterclaimed for divorce on grounds of desertion. *N.J.S.A.* 2A:34–2(b). The initial proceeding was concerned solely with financial matters pertaining to alimony, child support and equitable distribution. The issue of custody appeared to be settled by the pleadings until April 12, 1979 when in the course of its decision the trial court decreed *sua sponte* that both legal and physical custody would be shared by the parties.[4]

The court supported the decree with reference to the "uniqueness" of this case. It found the parties to be "sophisticated," with a generally "positive attitude between themselves with regard to the girls;" that plaintiff's income is sufficient to support two households; that the children's ages presented no obstacle; that the proximity of the residences would enable continuity of schooling despite changes in physical custody; that the prior visitation arrangement had been maintained "with no difficulty whatever" between the parties; and, finally, that because the girls were adopted, they needed "the benefit, contact, and security of both parents."

Shortly thereafter, defendant moved for an order amending the findings and judgment of the trial court on the issue of joint custody. Plaintiff opposed the motion and both parties filed lengthy certifications. After reviewing the certifications and hearing argument, the trial court ordered a plenary hearing on the issue of custody. At the hearing defendant testified and also produced a child psychiatrist to testify on her behalf. Plaintiff chose not to testify himself, although he had done so extensively during the first proceeding, but offered three experts in support of his lately-adopted position favoring joint

---

[4] We pause here to note that when a trial court determines to provide a remedy that exceeds or substantially differs from the relief requested in the pleadings, a more advisable course of action would be to notify the parties regarding any new issues raised thereby and to provide an opportunity for the parties to address those issues before a decision is rendered. See, *e. g.*, *Mayer v. Mayer*, 150 *N.J.Super.* 556, 560 (Ch.Div.1977), in which the suggestion of joint custody was made by the court during settlement negotiations.

custody: a school psychologist, a clinical psychologist, and a psychiatric social worker. Also, in the course of the hearing the court for the first time met privately with the girls. As might be expected, the expert testimony on each side varied. Because of the acutely fact-sensitive nature of custody determinations, we offer more extended discussion of the expert testimony adduced at the hearing than might otherwise suffice.

Dr. Jerome Goodman, the expert called on behalf of Mrs. Beck, testified that he had interviewed the children and their mother and concluded that custody should remain with Mrs. Beck. Dr. Goodman reasoned that adopted children have a special need for security and that joint custody—particularly alternating physical custody—reduced constancy and hence would cause the children to experience insecurity. He noted that the parents' differing approaches to child rearing would aggravate this problem, the mother being highly structured and the father much less so. He also emphasized the desirability of having a "woman in the home" to provide identification and guidance for the girls and that there is "no substitute for mother" in such a role. Dr. Goodman thought alternating custody was artificial and contrived in nature and would be a source of embarrassment to the children. Given the fact that the girls were well-adjusted at the time of the hearing, he advised retaining the status quo. He expressed a general opposition to alternating physical custody, characterizing it as a "hokey arrangement" and "very risky." Although his qualifications as an expert regarding adopted children and child custody in general were unimpeachable, Dr. Goodman conceded that his exposure to joint custody was rather superficial.

The testimony of plaintiff-husband's expert clinical psychologist, Dr. Leonard Abramson, was offered to establish that the father was a fit parent. Based upon an interview with Mr. Beck and on certain psychological tests, the doctor testified that he found plaintiff to be "mature and well adjusted." He described Mr. Beck as "sensitive, flexible, non [sic] compulsive or rigid, not

overly gregarious" and having a genuine interest in the welfare of the children.

On the issue of the advisability of joint custody for the Becks plaintiff offered the expert testimony of Dr. Warren Clark, a school psychologist and a proponent of such arrangements. He favored joint custody in this case based on his opinion, formed after interviewing Mr. Beck and the children, that it would foster the children's relationship with both parents and would have a long-term beneficial impact on the girls' development as young women. In his view, because the children would become aware that their mother is their only "real" parent in the sense of making decisions about their lives, mere visitation rights granted to a non-custodial "zoo daddy" would not be conducive to the development of a father-daughter relationship. He was confident that the children, being adjusted, intelligent, and having affection for both parents, would be able to adapt to joint custody without difficulty.[5] Although he acknowledged the risks involved in joint custody, Dr. Clark stressed that the risk inherent in sole custody, namely, the girls' loss of their relationship with their father, was equally serious.

Noting that the children expressed opposition to the joint custody decree, Dr. Clark attributed their reaction to the fact that they misunderstood joint custody as something that would deprive them of their mother and their home. He predicted that once it went into effect, the girls would recognize the arrangement not only as retaining what they had before but as adding something more—an additional home. Dr. Clark felt that differences in child rearing practices do not necessarily militate against joint custody determinations and that children can understand that different people will set different standards for them. According to Dr. Clark it is inconsistent treatment from *one* parent that tends to cause problems for children.

---

[5]He noted that they spoke negatively about their father only in response to questions regarding the custody decree.

Finally, Dr. Clark noted that the ideal joint custody arrangement would be one arrived at by agreement between the parties. Nevertheless, in the absence of such an agreement, joint custody could successfully be carried out by court decree provided the parents put the best interest of the children first and were provided with certain "ground rules" governing the custody arrangement. Dr. Clark, however, had had no experience with the particular physical custody arrangement proposed in this case.

Regarding joint custody generally, Mr. Beck presented the testimony of Dr. Judith Greif, a psychiatric social worker who has conducted independent research on the topic. Dr. Greif had not interviewed any of the Beck family members, but her testimony supported much of Dr. Clark's previous testimony. She testified that as long as both parents are fit, "the most important thing is to maintain the child's open and meaningful access to both parents." Furthermore, in her opinion it was contrary to the best interests of the children to deprive them of an adequate parent simply because the other is deemed better. Visitation, for Dr. Greif, was not "meaningful contact." She stressed that the continuity of relationship allowed by alternating physical custody is more important than the discontinuity of physical environment caused by it.

Dr. Greif's research indicated that joint custody can work even where the parents are openly hostile toward on another as long as both parents care about their children. In her words, "there needs to be good input to the children, there need not be such good input between the parties." None of the joint custody cases studied by Dr. Greif involved adopted children.

At the conclusion of the plenary hearing the trial court reiterated its prior findings and modified its original decision. Viewing the issue in terms of the importance of fatherhood in the lives of the two girls, it concluded that the lack of real

contact with the father would have negative developmental effects, particularly because the girls are adopted. Although recognizing the "impeccable" qualifications of Dr. Goodman, the court found him unpersuasive. It found more rational the viewpoints of Drs. Greif and Clark and hence adopted their conclusions.

The trial court stressed that although defendant's care of the girls was more than adequate, she is limited by an inability to be both a mother and a father. It found Mrs. Beck to be a "sensible" person, but also somewhat bitter and "stiff lipped" and more partisan than plaintiff, whom he described as "a rather * * * relaxed type of man." Noting that Mrs. Beck "honestly objects to the plan because she contends she cannot cooperate with her former husband," the court concluded, based on the testimony of Dr. Greif, that an amicable relationship between the parties is "comparatively unimportant and not essential" as long as the parties "are looking out for the best interests of the children." [6]

Referring to this state's policy of seeking maximum visitation by the non-custodial parent in sole custody cases and to *N.J.S.A.* 9:2–4, which gives both parents equal rights to custody, the trial court concluded that "there is a real purpose of fatherhood as well as motherhood." Furthermore, it distinguished between custodial time and visitation, describing the former as "meaningful contact" and the latter as "entertainment time." It saw the contact and involvement of the girls with two fit, concerned parents as "going to be what's good for the girls." Finally, it reiterated that this case is uniquely suitable to joint custody and ordered that the parents share "joint control and supervision" of

---

[6]We observe that the problem of noncooperation arose only in the wake of the initial joint custody decree. The parties cooperated satisfactorily in the pre-divorce visitation routine, and Mrs. Beck does not object to future visitation rights being given the girls' father provided she is granted sole custody.

the children with alternating physical custody for four month periods.[7]  It also provided for counselling services for the family.

## IV

The Appellate Division reversed, ruling that Mr. Beck, as the party seeking to change the status quo, had failed to satisfy the burden of proving that "the potentiality for serious psychological harm accompanying [implementation of the plan] will not become a reality," pursuant to *Sorentino v. Family & Children's Society of Elizabeth* (*Sorentino I*), 72 *N.J.* 127, 133 (1976).  See 173 *N.J.Super.* at 42.  It determined that the trial court's award of joint custody "could not reasonably have been reached on sufficient credible evidence."  *Id.* at 43.  The court below then proceeded to make its own findings in favor of Mrs. Beck.

Plaintiff-husband contends that the determination of the trial court was well within its discretion, consistent with a developing body of case law, and uniquely appropriate to the facts of this case.  He challenges the action taken by the Appellate Division, urging particularly that the burden of proof should not have been imposed on him and that the court exceeded the proper scope of review.  On the other hand defendant-wife argues that the joint custody decree is without basis in law and unwarranted by these facts, that the trial court gave insufficient weight to the preference of the children, and that it erred in raising the custody issue *sua sponte.*

## V

We find the determination of the Appellate Division to be fundamentally flawed in two respects.  As a matter of law, reliance on *Sorentino I*, an adoption case, is inappropriate when the issue before the court is that of an initial child custody

---

[7]The rationale offered for the four month period was that "it gives the girls an opportunity to settle in" and "it happens to take care of alternating holidays."

determination in the divorce context. See *In re N.*, 96 *N.J.Super.* 415, 423 (App.Div.1967); *S.M. v. S.J.*, 143 *N.J.Super.* 379, 382–83 (Ch.Div.1976). In addition, we hold that the record in this case reveals sufficient credible evidence to support the decision of the trial court.

■ In respect of the *Sorentino I* argument, it must be kept in mind that in adoption matters the adoptive parent seeks the permanent termination of the child's relationship with the natural parent. Because such a permanent and drastic action is viewed as potentially harmful to the child, the party seeking to change the status quo has the burden of proving that the child will not suffer serious psychological harm. In contrast, post-divorce custody determinations seek to some extent to provide the children with access to both parents and to avoid alienation from either one. Hence, sole custody decrees almost invariably grant visitation rights to the noncustodial parent. Moreover, our courts have imposed a duty on the custodial parent to be active in aiding and encouraging the sincere efforts of the noncustodial parent "to enhance the mutual love, affection and respect between himself and his child." *Sheehan v. Sheehan*, 51 *N.J.Super.* 276, 291 (App.Div.), certif. den., 28 *N.J.* 147 (1958). Since post divorce custody decrees seek to preserve, not destroy, parent-child attachments, the procedural safeguards provided by *Sorentino I* are not applicable.

■ In addition, the Appellate Division's application of *Sorentino I* to this case misconstrues the notion of status quo. Our concern in that case was not for the physical attributes of custody, but rather for the psychological, emotional and relational "status quo" of a child about to be separated from the only parents it had ever known. See *Sorentino I, supra*, 72 *N.J.* at 133. In this case the record indicates that the children have maintained a close relationship with both parents. The Appellate Division's approach would ignore the relationships between the children and their father and focus on the physical custody

aspect of the post-separation living arrangement as the status quo—an ill-advised elevation of form over substance.[8]

■ With regard to the issue of the scope of appellate review, it appears that the Appellate Division improperly applied the rule enunciated in *State v. Johnson,* 42 *N.J.* 146 (1964). In *Johnson* this Court ruled that an appellate tribunal faced with a contention that the trial court erred in its determination of the facts must determine at the outset

> whether the findings made could reasonably have been reached on sufficient credible evidence present in the record. When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result, even though it has the feeling it might have reached a different conclusion were it the trial tribunal. That the case may be a close one or that the trial court decided all evidence of inference conflicts in favor of one side has no special effect. [*Id.* at 161–62 (citations omitted).]

This rule applies to custody cases, *DeVita v. DeVita,* 145 *N.J.Super.* 120, 123 (App.Div.1976), as well as to findings regarding the testimony of expert witnesses, *M.P. v. S.P.,* 169 *N.J.Super.* 425, 447 (App.Div.1979) (dissenting opinion).

■ We view the testimony of Drs. Greif and Clark, summarized above, *supra* at 491–492, as constituting sufficient credible evidence upon which the trial court could reasonably have reached its decision. We certainly find no basis for the Appellate Division's apparent conclusion that only Mrs. Beck and Dr. Goodman were credible witnesses. If anything, the record reflects that whereas Drs. Greif and Clark were quite knowledgeable about the concept of joint custody, Dr. Goodman was only superficially familiar with it. Despite its reference to the language of *Johnson,* see 173 *N.J.Super.* at 43, the Appellate

---

[8]The key element here is the character or quality of the parent-child relationship. In the absence of the type of relationship adverted to *infra* at 497, joint custody would be inappropriate. Moreover, when seeking joint custody after an initial custody determination has been made, even a parent enjoying such a relationship must satisfy the same burden of proof as applies to anyone seeking to change a custody decree, namely, a change of circumstances warranting modification. See *Mimkon v. Ford,* 66 *N.J.* 426, 438 (1975); *M.P. v. S.P.,* 169 *N.J.Super.* 425, 431 (App.Div.1979).

Division appears to have engaged in an unwarranted independent analysis of the trial court record.

## VI

■ The question of whether a trial court may make a *sua sponte* custody determination need not long detain us. The paramount consideration in child custody cases is to foster the best interests of the child. This standard has been described as one that protects the "safety, happiness, physical, mental and moral welfare of the child." *Fantony v. Fantony*, 21 *N.J.* 525, 536 (1956). See also *N.J.S.A.* 9:2–4 ("[T]he happiness and welfare of the children shall determine the custody or possession.") It would be incongruous and counterproductive to restrict application of this standard to the relief requested by the parties to a custody dispute. Accordingly, a *sua sponte* custody determination is properly within the discretion of the trial court provided it is supported by the record. However, we emphasize again the desirability of the trial court giving the parties an opportunity to address any new issues raised by the court. See *supra* at 489 n. 4.

## VII

The factors to be considered by a trial court contemplating an award of joint custody require some elaboration. As indicated heretofore, *supra* at 488, we perceive that the necessary elements will coalesce only infrequently.

## A

■ First, before embarking on a full-blown inquiry into the practicability of a joint custody arrangement, the court must determine whether the children have established such relationships with both parents that they would benefit from joint custody. For such bonds to exist the parents need not have been equally involved in the child rearing process. See Bratt, *supra*, 67 *Ky.L.J.* at 296. Rather, from the child's point of view

it is necessary only that the child recognize both parents as sources of security and love and wish to continue both relationships.

B

■ Having established the joint custody arrangement's potential benefit to the children, the court must focus on the parents in order to determine whether they qualify for such an arrangement. At a minimum both parents must be "fit"—that is, physically and psychologically capable of fulfilling the role of parent. Miller, *supra*, 13 *Fam.L.W.* at 369. In addition, they must each be willing to accept custody, see Bratt, *supra*, 67 *Ky.L.J.* at 303, although their opposition to *joint* custody does not preclude the court from ordering that arrangement. Rather, even if neither party seeks joint custody, as long as both are willing to care for the children, joint custody is a possibility.[9]

■ The most troublesome aspect of a joint custody decree is the additional requirement that the parent exhibit a potential for cooperation in matters of child rearing. This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor. See Folberg & Graham, *supra*, 2 *U.Calif.D.L.Rev.* at 550. Moreover, the potential for cooperation should not be assessed in the "emotional heat" of the divorce.

If the parents outside of the divorce setting, have each demonstrated that they are reasonable and are willing to give priority to the best interest of their child,

---

[9]Although joint custody may be less likely to succeed if ordered by the court than if achieved by the parents' agreement, court-ordered joint custody is likely to be no more prone to failure than court-ordered sole custody following a divorce custody proceeding. See Folberg & Graham, *supra*, 12 *U.Calif.D.L.Rev.* at 579.

then the judge need only determine if the parents can separate and put aside any conflicts between them to cooperate for the benefit of their child. The judge must look for the parents' ability to cooperate and if the potential exists, encourage its activation by instructing the parents on what is expected of them. [*Id.* at 580.]

The necessity for at least minimal parental cooperation in a joint custody arrangement presents a thorny problem of judicial enforcement in a case such as the present one, wherein despite the trial court's determination that joint custody is in the best interests of the child, one parent (here, the mother) nevertheless contends that cooperation is impossible and refuses to abide by the decree. Traditional enforcement techniques are singularly inappropriate in a child custody proceeding for which the best interests of the child is our polestar. Despite the obvious unfairness of allowing an uncooperative parent to flout a court decree, we are unwilling to sanction punishment of a recalcitrant parent if the welfare of the child will also suffer. However, when the actions of such a parent deprive the child of the kind of relationship with the other parent that is deemed to be in the child's best interests, removing the child from the custody of the uncooperative parent may well be appropriate as a remedy of last resort. See *Dodd v. Dodd*, 93 *Misc.*2d 641, 403 *N.Y.S.*2d 401, 406 (Sup.Ct.1978); *cf. Sheehan v. Sheehan, supra,* 51 *N.J.Super.* at 291 (even in sole custody case, if custodial parent desires to retain custody, he or she must aid and encourage efforts of noncustodial parent to enhance mutual love, affection and respect between that parent and the child).

In *Dodd*, the Supreme Court of New York found that a fourteen month interim joint custody arrangement had failed because of the hostility between the parents. In awarding sole custody to the mother, the court characterized her as "more flexible and conciliatory" than the father and noted that "placing custody with Mrs. Dodd will maximize the role which both parents should play in their children's lives." 93 *Misc.*2d 641, 403 *N.Y.S.*2d at 406. Although an award of sole custody to Mr. Beck in this case may be a closer question, (in *Dodd*, the mother had also been the primary caretaker of the children, as was the

mother here), it cannot be ruled out as a potential enforcement tool, albeit one to be considered only after all other measures have failed.

## C

■ In addition to the factors set forth above, the physical custody element of a joint custody award requires examination of practical considerations such as the financial status of the parents, the proximity of their respective homes, the demands of parental employment, and the age and number of the children. Joint physical custody necessarily places an additional financial burden on the family. Although exact duplication of facilities and furnishings is not necessary, the trial court should insure that the children can be adequately cared for in two homes. The geographical proximity of the two homes is an important factor to the extent that it impinges on school arrangements, the children's access to relatives and friends (including visitation by the noncustodial parent), and the ease of travel between the two homes. Parental employment is significant for its effect on a parent's ability properly to care for the children and maintain a relationship with them. The significance of the ages and number of the children is somewhat unclear at present, see, e. g., Miller, *supra*, 13 *Fam.L.W.* at 374, and will probably vary from case to case, requiring expert testimony as to their impact on the custody arrangement.

■ If joint custody is feasible except for one or more of these practical considerations, the court should consider awarding legal custody to both parents with physical custody to only one and liberal visitation rights to the other. Such an award will preserve the decision-making role of both parents and should approximate, to the extent practicable, the shared companionship of the child and non-custodial parent that is provided in joint physical custody.

### D

Finally, as in all custody determinations, the preference of the children of "sufficient age and capacity" must be accorded "due weight." *N.J.S.A.* 9:2–4; *Lavene v. Lavene*, 148 *N.J. Super.* 267, 271 (App.Div.1978). This standard gives the trial court wide discretion regarding the probative value of a child's custody preference.

Our review of the record indicates that the trial court gave proper consideration to the preference expressed by the children, eight and ten years old at the time of trial. After interviewing them privately, the court stated for the record that the children were sincere and honest in their desire to remain with their mother. However, observing that they expressed love for both parents and wanted to continue visitation with their father, the court concluded that they had been "persuaded" to make their statements of preference and that the defendant's negative attitude toward joint custody had "consciously or unconsciously spilled over" to the children.[10] Given this conclusion and the tender years of the children, a determination that did not fully accommodate their express wishes was not unreasonable.

### VIII

Having found the decision of the trial court to be based on sufficient credible evidence, we would ordinarily reinstate it. However, in child custody cases we are always mindful that our task is to act in the best interests of the child as presently situated. Over two years have elapsed since the original decree of joint custody. Although we uphold that decree as originally made, we recognize that the facts and relationships upon which it was based may have changed dramatically. Therefore, we

---

[10]The court noted, for example, that Mrs. Beck permitted the children to read the court papers and apparently pointed out inconsistencies in Mr. Beck's certifications; thus the girls characterized him as a "liar."

remand this case to the trial court for further fact-finding and a determination consonant with this opinion. We admonish the court to make a speedy but thorough investigation into the present circumstances of the parties and their children—using whatever procedural mechanism and hearing what further testimony, if any, is deemed necessary—so that this matter may be expeditiously and properly laid to rest.

The judgment of the Appellate Division is reversed and the case remanded to the trial court. We do not retain jurisdiction.

SULLIVAN, J., dissenting.

I would affirm the judgment of the Appellate Division essentially for the reasons stated in its opinion. A judicial order for joint custody of children by divorced parents may be appropriate under some circumstances. However, I do not consider it "the preferred disposition" in custody cases as the majority opinion, despite some restrictive language, seems to suggest. Certainly, on the undisputed facts of this case it is not in the best interests of the children involved.

These young girls, who are now entering the age of puberty with its accompanying physical and physiological changes, should be permitted to continue to live with their mother rather than *forced* (as is the case) to rotate between the only home they know and their father's present residence on a joint custody basis, as was ordered by the trial court. In addition, the security of home life and the stability of environment are of great importance to the physical and emotional well-being of young children. Shuffling them, their clothing and possessions between two homes every four months is not the way to resolve the problem of custody.

I would leave the children with the mother whose care of them was found to be more than adequate and, as the Appellate Division held, afford plaintiff reasonable rights of visitation.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance* —Justice SULLIVAN—1.