No. 85-21

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

_____

IN RE THE CUSTODY AND SUPPORT
OF B.T.S.

_____

APPEAL FROM: District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable Chan Ettien, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kathleen Richardson argued, Havre, Montana

For Respondent:

Hash, Jellison, O'Brien & Bartlett; James C. Bartlett
argued, Kalispell, Montana

_____

Submitted:    June 27, 1985

Decided:    January 9, 1986

Filed: JAN 9 - 1986

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

D.A., the mother, appeals from a judgment of the District Court of the Twelfth Judicial District, Hill County, awarding joint custody of B.T.S. to K.S., the father, and herself and making her award of one-half the prenatal care costs payable in installments beginning in January 1987 with no interest due until then. Reversed for findings.

The mother and father were divorced on August 7, 1981. They were not aware that the mother was pregnant at the time of the dissolution. When their son, B.T.S., was born two months premature on December 17, 1981, the mother selected her maiden name as his surname.

Both parents resided at Swan Lake, Montana at the time of the birth but the three of them never resided together as a family unit. Following B.T.S.'s twelve-day hospitalization after his birth, the mother provided his primary care. Because he was premature and underweight, he slept on a breathing monitor device and had to be awakened every three hours to be fed.

K.S. visited B.T.S. in the hospital two or three times. When the child went home, K.S. visited twice a week at first. Later, the meetings dwindled to once a week because he and the mother could not get along. D.A. returned to her teaching job when B.T.S. was about three weeks old. She asked K.S. to assist with the night feedings and he agreed to stay two nights a week. He did not return after one week. His only other contact with the child during the first nine months occurred when he occasionally babysat.

2

D.A. remarried in December 1982. She and her husband farm during the summer months. In the winter they live in Whitefish where he works in a local business.

The father moved to Phoenix, Arizona to attend school in October 1982 when B.T.S. was about nine months old. He did not contact the mother until he returned to Swan Lake for Christmas. At that time, B.T.S. stayed with him for one week at the paternal grandparents' home where B.T.S. was familiar and comfortable. After he went back to Phoenix he did not contact the mother again until April when he wanted to arrange a visit in July, 1983. The parents disagreed over the visitation arrangements. The mother suggested B.T.S. and his father spend one week getting reacquainted through daytime visits with overnight visits the second week. The father wanted to take B.T.S. with him to Helena the first week, while he worked for relatives, and spend another week with him at the paternal grandparents' home. The father went to Helena alone. When he returned, he spent one day with B.T.S. at the maternal grandparents' home. The mother then brought B.T.S. to the paternal grandparents' home where he was familiar and he spent four days with his father. After this visit, the parents did not communicate except to arrange a one week visit over Christmas in 1983.

On July 19, 1983, the father petitioned the court for joint custody of B.T.S. and requested physical custody, claiming the mother refused to allow frequent and continuous contact between the child and himself. He also requested B.T.S.'s surname be changed to his own and a determination of child support. The cause was heard on April 24, 1984. At trial, Lawrence G. Jarvis, Ph.D., a clinical psychologist specializing in young child development and family

3

relationships, testified. He expressed the following opinions: (1) a child B.T.S.'s age would suffer anxiety and have difficulty adjusting to an abrupt change in environment; (2) the mother and stepfather had warm and loving relationships with B.T.S.; (3) B.T.S. was doing well in his development, motor skills and language; (4) B.T.S. is "bonded" to his mother; (5) custody should remain with the mother because extended periods of separation (i.e. overnight) would cause anxiety in a two-year old; (6) the father should re-enter the scene gradually to establish a long term, ongoing relationship; and (7) over a period of time, they could move into more extended visits "in line with the father's needs." The District Court entered its findings, conclusions and order on October 30, 1984. The court determined that "nothing precludes the awarding of joint custody;" joint custody is in B.T.S.'s best interests; both parents are likely to allow contact with the non-custodial parent; B.T.S. should carry his father's surname; one-half the prenatal costs should be paid by the father in $100 monthly installments beginning January 1987 with interest charged from January 1987; and the father should pay child support of $100 per month. The court's order also set out the arrangement for physical custody. B.T.S. stays with his mother from August 20 to June 10, and with his father from June 11 to August 19. The non-custodial parent is to have other reasonable visitation and the parents are to alternate the major holidays. The mother does not dispute the name change or the award of child support on appeal.

We address three issues:

4

(1) Did the District Court err by awarding custody of B.T.S. jointly to his mother and father?

(2) Did the District Court err in the manner in which physical custody was divided between the mother and father?

(3) Did the District Court err by ordering reimbursement of the costs of the child's birth payable in installments which would not begin until January 20, 1987 and by not awarding interest from the date of judgment?

We apply the following standard of review in custody issues:

> This Court will not substitute its judgment for that of the trier of fact. We will consider only whether substantial credible evidence supports the findings and conclusions. Findings will not be overturned unless there is a clear preponderance of evidence against them, recognizing that evidence may be weak or conflicting, yet still support the findings.

Jensen v. Jensen (Mont. 1981), 629 P.2d 765, 768, 38 St.Rep. 927, 930, cited in In re the Custody of C.C. (Mont. 1985), 695 P.2d 816, 818, 42 St.Rep. 190, 193. The appellant must overcome the presumption that the judgment of the District Court is correct. In re the Marriage of Jensen (Mont. 1979), 597 P.2d 733, 36 St.Rep. 1259.

Sections 40-4-222 and -223, MCA require that an award of joint custody be in the best interests of the child. Relevant factors in any custody determination include:

> (1) the wishes of the child's parent or parents as to his custody;
>
> (2) the wishes of the child as to his custodian;
>
> (3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;

5

(4) the child's adjustment to his home, school, and community; and

(5) the mental and physical health of all individuals involved.

Section 40-4-212, MCA. We agree with appellant's contention that additional specific criteria should be considered when determining joint custody.

This Court recognized a commonly used specific factor in Schuman v. Bestrom (Mont. 1985), 693 P.2d 536, 539, 42 St.Rep. 54, 57, when we stated ". . . it seems clear that joint custody will not be satisfactory unless it exists between parents willing to cooperate with each other in custody matters." Citing Lembach v. Cox (Utah 1981), 639 P.2d 187, 200. Other jurisictions characterize this as a finding that both parents are able to communicate and cooperate in promoting their child's best interests, Beck v. Beck (N.J. 1981), 432 A.2d 63, 72, and whether the parents have the ability to cooperate in their parental roles, Lumbra v. Lumbra (Vt. 1978), 394 A.2d 1139, 1142. See also Braiman v. Braiman (N.Y. 1978), 378 N.E.2d 1019; Wilcox v. Wilcox (Mich. 1981), 310 N.W.2d 434; and 17 ALR4th 1013, Joint Custody of Children. This specific factor relates to subsection (1) of § 40-4-212, MCA, the parents' wishes as to custody. In this case the respondent requested joint custody and the appellant requested sole custody of B.T.S. subject to the father's visitation. Both parties testified as to their inability to agree about B.T.S.'s welfare. The appellant felt she carried the entire burden. She travelled with B.T.S. to other cities for visitation; she maintained the child's contacts with the paternal grandparents; and she sent pictures to the family. The respondent did not write or telephone on any regular or consistent basis after he left

6

Montana. No evidence in the record indicates he attempted to become involved in decisions about B.T.S.'s welfare. Contrary to respondent's contention, § 40-4-212(1), MCA is not irrelevant and "always self-evident."

Section 40-4-212(3), MCA includes the child's interaction and interrelationship with his parents and others who significantly affect the child's best interests as a relevant factor in the custody determination. Here, the District Court's only findings on B.T.S.'s relationships were that he and his step-father have developed a firm father-son relationship and that he has a good relationship with his grandparents. The District Court made no findings as to his interaction or interrelationship with either of his natural parents. "The District Court need not make specific findings on each of the elements. (Citations omitted.) However, the 'essential and determining facts upon which the District Court rested its conclusion' must be expressed." In Re Marriage of Hardy (Mont. 1984), 685 P.2d 372, 374, 41 St.Rep. 1566, 1569; citing, Cameron v. Cameron (1982), 197 Mont. 226, 231, 641 P.2d 1057, 1060. Particularly in a case such as this, with a post-divorce birth and an absent parent requesting joint custody, findings regarding the interaction and interrelationship of the child with each parent are necessary.

A third specific criterion important to an award of joint custody, is the geographic proximity of the parents' residences. In Quinn v. Quinn (Mont. 1981), 622 P.2d 230, 38 St.Rep. 93, this Court remanded an award of joint custody to determine whether the best interests of the minor children were being served since the geographic distance between the parties appeared to be fostering antagonism and instability

7

in the home environment. The distance affects the parent's access to each other for joint decisions and the extent and type of interaction between each parent and the child. In this case, the uncertainty of the father's residence also impinges on B.T.S.'s stability in his environment.

The declared legislative intent for joint custody, as stated in § 40-4-222, MCA, is "to assure minor children frequent and continuing contact with both parents . . . and to encourage parents to share the rights and responsibilities of child rearing." This statement is based on sections 4600 and 4600.5 of California's Civil Code. Like Montana, California requires the courts to award custody according to the best interest of the child. However, 4600.5(c), Cal.Civ.Code, requires more than a statement that joint custody is in the child's best interests.

> Whenever a request for joint custody is granted or denied, the court, upon the request of any party, shall state in its decision the reasons for granting or denying the request. A statement that joint physical custody is, or is not, in the best interests of the child shall not be sufficient to meet the requirements of this subdivision. (Emphasis added.)

Changes enacted to Montana's joint custody provisions by the 49th Legislature, effective October 1, 1985, reflect the California requirement.

Section 40-4-224(1), MCA, now provides:

> Upon application of either parent or both parents for joint custody, the court shall presume joint cutody is in the best interests of a minor child unless the court finds, under the factors set forth in 40-4-212, that joint custody is not in the best interests of the minor child. If the court declines to enter an order awarding joint custody, the court shall state in its decision the reasons for denial of an award of joint custody. Objection to joint custody by a parent seeking sole custody is not a sufficient

> basis for a finding that joint custody is
> not in the best interests of a child, nor
> is a finding that the parents are hostile
> to each other.

Section 40-4-223(3), MCA, now provides: ". . . the court shall state in its decision the reasons and factors considered in making the award." Reading these sections together, a district court must make findings and state conclusions based on those findings even where joint custody is awarded in accordance with the newly enacted presumption. Thus, the above discussion would apply under the recent changes as well as under the former statutory language.

On remand, the District Court should consider and make findings on these useful specific factors along with the general criteria in § 40-4-212, MCA, to determine whether joint custody is in B.T.S.'s best interests.

The second issue concerns the District Court's order that physical custody of B.T.S. be with appellant from August 20 to June 10 and be with respondent from June 11 to August 19. Each parent has reasonable visitation with reasonable notice and alternates custody on major holidays. "[T]he physical custody element of a joint custody award requires examination of practical considerations such as the financial status of the parents, the proximity of their respective homes, the demands of parental employment, and the age and number of children." Beck, 432 A.2d at 72. The proximity of the parents' residences and the apparent uncertainty of the father's residence are of concern here. We recognize the uniqueness of these particular circumstances. B.T.S. was born after the divorce. The father has spent the greater portion of B.T.S.'s life in different states. B.T.S. has never experienced a family unit with his natural parents and

9

has not had an opportunity to develop a father-son bond with respondent. Finally, the father has never been a decision maker for B.T.S. Under these circumstances, the order should contain findings to support the division of physical custody. This alone would be sufficient ground for remand. Jones v. Jones (Mont. 1980), 620 P.2d 850, 37 St.Rep. 1973.

In addition, the evidence at trial supports a different division of physical custody. At trial, Dr. Jarvis testified that abrupt changes in B.T.S.'s environment would cause anxiety and would be a difficult adjustment for him. He expressed the opinion that extended periods of separation such as overnight visits would adversely affect B.T.S. and that the father should re-enter gradually to establish a long-term, ongoing relationship. He recognized that extended visits were "in line with the father's needs." The mother expressed concern that forcing a child of this age to experience extended visitation without "warm-up" time to the father would be detrimental to B.T.S. The psychologist testified that this was an appropriate concern with a child this age. Even the father's testimony coincided with the opinions of the mother and Dr. Jarvis:

> At this point, I think one week at a time is about all that [B.T.S.] could take away from his parents, or away from his home. As he grows older, I think it should grow up [sic] to be close to a five week period. Probably by the time that he is in school, at seven or eight.

Neither party offered any evidence to support the extended visitation awarded. On remand, particularly because of the unique circumstances of this case, the District Court should enter explicit findings on physical custody. These findings should reflect the District Court's consideration of the evidence presented at trial.

This holding is consistent with newly revised § 40-4-223(3), MCA, requiring a court to "state in its decision the reasons and factors considered in making the award." New revisions in § 40-4-224(2), MCA, also reflect the Legislature's concern with the division of time in an award of physical custody.

> For the purposes of this section, "joint custody" means an order awarding custody of the minor child to both parents and providing that the physical custody and residency of the child shall be allotted between the parents in such a way as to assure the child frequent and continuing contact with both parents. The allotment of time between parties shall be as equal as possible; however, each case shall be determined according to its own practicalities with the best interests of the child as the primary consideration.

The statement that "each case shall be determined according to its own practicalities" recognizes that allotment of time may be skewed. The District Court should consider whether a division of physical custody allowing a gradual build-up of time for the father, consistent with the evidence presented at trial and consistent with the new revisions in the statutes on joint custody awards, would be appropriate if joint custody is awarded.

The District Court awarded judgment to appellant for respondent's share of medical expenses incident to B.T.S.'s birth in the amount of $2,612. No interest was to be charged until repayment began at the rate of $100 per month beginning on January 20, 1987. The District Court acted within its discretion when it scheduled monthly installments. However, under § 27-1-211, MCA, appellant is entitled to recover interest from the date of judgment. Callihan v. Burlington Northern, Inc. (Mont. 1982), 654 P.2d 972, 39 St.Rep. 2158.

11

Reversed for findings consistent with the above opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

12

Mr. Justice Frank B. Morrison, Jr. dissents as follows:

I believe the majority opinion in this case is but a further example of this Court's substituting its judgment for that of the trial court and/or the jury. The trial court is in the best position to observe the demeanor of the witnesses and thereby acquire a feel for their credibility and even their character, which no cold record can possibly convey. Only the trial judge is in a sound position to decide matters of custody.

The majority opinion seeks to reverse the lower court's discretion by finding inadequacies in the court's findings. The majority's approach is unrealistic. Many trial judges in this state operate without the benefit of law clerks. The volume of their work precludes making findings on every conceivable statutory guideline. The majority's approach can most accurately be characterized as nit-picking.

I would affirm the judgment of the District Court.

Justice

Mr. Justice John C. Sheehy, dissenting:

I dissent.

The majority opinion will further encumber the already beleaguered judges of the district courts in custody cases, and unnecessarily so in cases where joint custody is proper.

The majority opinion requires findings by district judges of three additional criteria that are not found in the statute. The majority mandate that in joint custody cases the District Court find (1) that the parents have the ability to cooperate in their parental roles, (2) that the child has an established relationship with both parents and sees them as a source of love and security, and (3) that the court consider the geographic proximity of the parent's residences. Those criteria make it impossible for a father in the circumstance of the respondent here ever to have joint custody of his minor child.

As to the first criterion, the mother does not want joint custody. She demonstrates no ability to cooperate. Her petition requests that she be given sole custody. Her wish to achieve sole custody is contra to public policy, declared in section 40-4-222, MCA of this state that minor children have "frequent and continuing contact with both parents after the parents have separated . . . and to encourage parents to share the rights and responsibilities of child rearing in order to effect" the State policy. Section 40-4-222, MCA.

The second criterion mandated by the majority is impossible for this father because the mother has made it nearly impossible for the father to have visitation with the child and the transcript in this cause is a history of the

14

obstructiveness of the mother in preventing the father from getting to know his child. The father has been prevented by the mother from an established relationship with his child. For that reason the District Court found that "the parties have experienced great difficulty in arranging visitation between petitioner [father] and [BTS], most difficulty engendered by respondent [mother] dictating terms of visitation."

The third criterion, geographic proximity should not be considered a deterrent to joint custody, especially as worked out by the court in this case.

Under the statutes applicable, the District Court has no duty to make the findings for which the majority are now remanding this cause. Section 40-4-224, MCA provides that when a parent requests joint custody, "the court shall presume joint custody is in the best interests of a minor child unless the court finds, under the factors set forth in 40-4-212, that joint custody is not in the best interests of the minor child."

Under section 40-4-224, MCA, the presumption of the law is that joint custody is in the best interests of the minor child. It is only when the District Court finds against joint custody that it must set forth the factors in section 40-4-212, which militate against joint custody. The majority opinion reverses the provisions of section 40-4-224 and requires the District Court to make findings explaining the factors in section 40-4-212, even when it has awarded joint custody. It is for that reason that I asserted above that the majority is encumbering the district courts with duties not mandated by the statute, unnecessary to the exercise of

15

their jurisdiction in joint custody cases and particularly unwieldly in cases such as we have facing us at bar.

The District Court in this case apparently disregarded the testimony of Dr. Jarvis, the clinical psychologist who testified in this case, and with good reason. Without ever interviewing the father, the witness purported to make findings with respect to the interrelationship of the child to the father only on the basis on what the mother had told him. Moreover, the findings of the District Court, based on the record, were that "each recognizes the other as a good parent capable of providing more than adequate care and affection for [BTS]." The testimony of Jarvis has no significance in view of that finding.

Even in its best light, the majority opinion is frustrating the public policy of this state. Separated or divorced parents of minor children are under the declared public policy of this state to be assured of "frequent and continuing contact" with the minor children. Section 40-4-222, MCA. It is our further public policy that "the allotment of time between parties shall be as equal as possible; however, each case shall be determined according to its own practicalities with the best interests of the child as a primary consideration." Section 40-4-224(2), MCA.

Having those public policy considerations in mind, the District Court determined that in the summertime, when the father was not attending school, he should have custody rights to the child for three months of the year. The father is under our statutes entitled to six months, if the practicalities of the case would work it out. The District Court arranged further for alternate holidays when each parent would enjoy the custody of the child. A more

16

practical way to handle the problem of joint custody here cannot be imagined, yet the majority, in a case where this child is four years old as of December 17, 1985 (the child having been deprived of his father's company by the mother during most of his life), remand the cause for further findings on vague and elusive considerations derived from an unwarranted distillation of joint custody statutes. I say it is time to give this child a chance to know his father. I would affirm the District Court.

John C. Sheehy
Justice