**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1578-16T2

ANDREW FLOCKHART,

     Plaintiff-Respondent,

v.

KAREN FLOCKHART,

     Defendant-Appellant.

_____

Argued January 15, 2019 – Decided May 24, 2019

Before Judges Rothstadt and Gilson.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FM-19-0224-13.

Bonnie C. Frost argued the cause for appellant (Einhorn, Harris, Ascher, Barbarito & Frost, PC, attorneys; Bonnie C. Frost, of counsel and on the briefs; Ivette R. Alvarez, on the briefs).

James P. Yudes argued the cause for respondent (James P. Yudes, PC, attorneys; James P. Yudes, of counsel; Elsie Gonzalez, on the briefs).

PER CURIAM

Defendant Karen Flockhart appeals and plaintiff Andrew Flockhart cross-appeals from their judgment of divorce (JOD) that the Family Part entered after a twelve-day trial. The JOD was accompanied by a forty-seven page decision in which the trial court set forth the reasons for each of its determinations. In their appeals, one or both of the parties challenge the court's rulings on alimony, custody, child support, and equitable distribution (ED). They also challenge the trial court's supplemental order on counsel fees and another order denying in part their motions for reconsideration and awarding additional counsel fees. For the reasons that follow, we affirm in part and vacate and remand in part for reconsideration of child support and one aspect of ED.

I.

The parties met in 1987 and married in 1995. They had three children: a daughter born in 1998; a son, born in 2000; and another son, born in 2004. The parties separated in 2012, and plaintiff filed for divorce in November of that year.

Prior to the marriage, plaintiff founded a successful landscaping business. By his twenty-first birthday, his business success enabled him to purchase a home that he and defendant lived in prior to their marriage. In approximately 1992, plaintiff expanded into the vegetative waste industry by leasing a farm

where he could turn his landscaping business' leaf waste into compost and brush into mulch.

Defendant, who had a graphic design degree and was employed by a company, helped plaintiff with his landscaping business. In 1998, before the birth of their first child, defendant stopped working at the company where she had been employed and did not work again until 2014, when she obtained part-time employment working ten to fifteen hours per week. At the time of trial, she worked approximately twenty-five hours per week as a receptionist for a physical therapy practice and made thirteen dollars per hour.

After their first child was born, plaintiff sold his home, and the parties purchased his parents' home, where the parties lived until 2003. In 2003, they sold that home and purchased a new larger home. Later, as described below, they sold that home and purchased a new larger house (Skyview Property).

In 1998, after defendant sold his landscaping business, the parties formed AKF Properties (AKF), an entity that they owned in equal shares. AKF purchased property at 20 Cotluss Road in Riverdale for $400,000, and rented out space in one of the buildings located on the property. Plaintiff used the money from the sale of his landscaping business and proceeds from a loan to

3

help purchase the Cotluss Road property and renovate the buildings on the property.

Soon after forming AKF, plaintiff formed Riverdale Environmental Recycling (RER) after representatives of the Borough of Riverdale approached him about helping the municipality deal with its residents' vegetative waste. RER was also owned by the parties in equal shares. RER leased property from the borough where RER would accept vegetative waste brought by borough residents, which RER would then process and sell as topsoil or mulch. Eventually, the leased property was not sufficient, so plaintiff rented part of a property on Clark Road in Wantage Township to process the vegetative waste, which, in 2004, he purchased for $400,000 through a company he formed, named Clark Road Realty, LLC (CRR). Plaintiff owned 100% of CRR.

Also in 2004, plaintiff formed another company, RER Supply, LLC (RERS), this time with his mother who owned fifty-five percent while plaintiff owned the remaining forty-five percent. Plaintiff's mother loaned the business $200,000, which it used to purchase equipment, but there was no written documentation of the loan.

In 2008, plaintiff acquired additional property for RER's business through yet another company he formed. The new company, Riverdale Realty LLC (RR)

purchased property at South Corporate Drive in Riverdale. Plaintiff owned ninety percent of RR, and defendant owned ten percent.

By 2006, while the parties' various companies expanded, their marriage began to unravel, especially after plaintiff admitted to having an affair. Plaintiff's abuse of alcohol also contributed to the marriage's demise. In 2008, plaintiff left the family home for three months. When he returned, he learned that defendant was romantically involved with other men, causing additional harm to the parties' relationship. The parties tried to address their issues through counseling and the purchase of the Skyview Property. Neither effort helped their situation. Alcohol abuse and violent behavior made matters worse. In 2012, plaintiff left the marital home, but the parties' relationship continued to sour, giving rise to allegations of domestic violence and unsubstantiated allegations of child abuse.

The parties' marital discord injured their relationships with their children. Initially, after plaintiff left the marital home, he was seeing his sons regularly, but saw his daughter only sporadically as she refused to communicate with him, despite his sending several texts to her every day, to which she would not respond. After plaintiff filed for divorce, he perceived that his children "started to change the way they looked at [him], the way they acted toward [him]."

5

During one episode of parenting time, plaintiff recalled that the children ran away from his house and went back to defendant's house. Plaintiff believed defendant was responsible for the change in his children's behavior towards him. He claimed she prevented him from seeing the children, although they expressed that they wanted very little to do with him.

Defendant denied preventing the children from visiting plaintiff, explaining that it was difficult to get them to visit him. She also denied disparaging plaintiff in the children's presence. However, according to certifications defendant filed during the divorce, she stated that it was not her responsibility to ensure that plaintiff had a healthy relationship with the children, and that a relationship with their father would be harmful to their daughter and older son.

The marital discord significantly affected their older son. He began to struggle in school and showed signs of depression. School officials arranged a meeting with the parties and their parenting coordinator, where the school officials raised concerns that the older son was self-medicating and told the parties that they should focus on their son's well-being, not his grades. A month later, after an incident at defendant's house, the older son moved in with plaintiff, and his grades improved. However, when defendant and the parties'

daughter began sending him frequent text messages, he got upset and his grades fell again.

The parties' deteriorating relationship significantly affected their ability to communicate with each other about the children. A court order in 2012 initially prevented plaintiff from having any contact with defendant for a significant time. According to defendant at trial, she had not spoken regularly with plaintiff in years, which made communicating very difficult. Instead, they corresponded via text or email, but even that was intermittent. Defendant complained that plaintiff did not consistently tell her about the older son's doctor's appointments and school reports. She stated that the lack of communication made it hard on the children and that she wanted better communication.

At the time of trial, the older son continued to live with plaintiff and plaintiff wished to maintain that arrangement. The younger son lived with defendant and plaintiff saw him every other weekend and one day during the week. Plaintiff realized that he could not force his daughter to have a relationship with him and cut back on his attempts to interact with her.

During the marriage, the family lived a very comfortable lifestyle and, in addition to the businesses, acquired various assets. Their marital home, the

7

Skyview Property, was eventually listed for sale at approximately $900,000, but was encumbered by a mortgage in almost the same amount. They also owned a timeshare in Florida, which was also encumbered by a mortgage in the amount of $254,385.24 at the time of trial, and they owned a lot on Lake Mohawk that was valued at $6500.

In addition to real property, plaintiff claimed he left $100,000 in cash in a safe in the basement, which he later admitted was $60,000 in 2012, and believed defendant had taken that money. Although defendant initially said that she did not take any money from the basement safe, she later admitted taking $7000 to $8000 from the safe for a trip. Defendant claimed that plaintiff took her engagement and wedding rings from her personal safe and took a Mercedes S550 owned by AKF out of the garage while she was away.

Plaintiff filed his complaint on November 21, 2012, and defendant filed an answer and counterclaim on February 5, 2013. For the next approximately four years, the parties engaged in contentious motion practice, with the trial court entering numerous orders finding defendant in violation of litigant's rights by not complying with court orders, including those directing her to cooperate with the court-appointed parenting coordinator and with the sale of the Skyview Property. In several of the orders, the court awarded plaintiff counsel fees. A

September 4, 2015 order barred defendant from presenting an expert witness because she failed to serve any expert reports.

At trial, in addition to the parties, various fact witnesses testified. Plaintiff also produced expert witnesses. A former friend of both parties testified on behalf of plaintiff. She described herself as having once been one of defendant's best friends. She primarily testified about her observations of defendant interfering with plaintiff's relationship with the children, including involving them in the litigation and coaching them as what to discuss with experts during evaluations. In addition, she shared her knowledge of defendant's extramarital affairs, her attempts to stall the sale of the marital home, and defendant's admission that she took the $60,000 from the basement safe. The friend also testified about defendant's alleged failure to properly parent her children, including allowing the parties' daughter to post inappropriate photos on the Internet and to have parties with alcohol at her home.

Plaintiff also presented the testimony of the court-appointed parenting coordinator, who appeared as a neutral third party. She described her meetings with and evaluations of the parties as well as her attempt to work with them to encourage the children to maintain good relationships with their parents. She also described her contact with and assessment of the children.

The parenting coordinator was concerned that defendant was causing the children's alienation from plaintiff. She observed that the children were unable to give concrete reasons for not wanting to see their father and that they repeated things that defendant had told the parenting coordinator, using the exact same words. She testified that she witnessed defendant engage the children in negative conversations about plaintiff and that she found that defendant would not follow the parenting coordinator's recommendations.

Plaintiff also called as expert witnesses a certified public account (CPA), who evaluated the businesses and prepared a "cash flow" analysis of plaintiff's income, and two real estate appraisers, one for the real estate the parties owned and the other for the timeshare.

The CPA conducted an evaluation of RER and RERS, which he stated were "intimately intertwined," requiring that they be valued jointly. He concluded that as of March 14, 2012—when plaintiff's mother gave him her share of RERS—their value was $830,000, but as of the date of the divorce complaint, it was $656,000,[1] due to a significant decline in income in 2012,

---

[1] On cross-examination, the CPA testified, over plaintiff's objection, that he met with defendant's valuation expert, who did not testify at trial, and they agreed that RERS and RER should be valued jointly at $600,000.

attributable to a poor economy and the need to purchase new equipment to maintain operations.

In his cash flow analysis, the CPA determined that plaintiff's average pre-tax cash flow for 2011 through 2013 was $331,182, and his average post-tax cash flow was $289,434. In 2013, his monthly post-tax cash flow was $17,421. Plaintiff's monthly payments for defendant and the children totaled $18,661, creating a monthly deficit of $1240 without considering any of plaintiff's own expenses, which required him to borrow money from his companies.

As of November 21, 2012, plaintiff had borrowed approximately $37,000 from the companies in the form of a shareholder loan, but by December 31, 2014, the amount had increased to $445,817, the majority of which was borrowed to pay for the divorce, plaintiff's pendente lite support obligations, and his own living expenses. The companies obtained that money from a line of credit that was completely drawn down. Plaintiff was individually liable to the companies for the loan, and his payments covered interest due to the bank. If plaintiff did not pay the loan, that money would be treated as taxable income. The CPA explained that he treated plaintiff's mother's $200,000 loan to the company as income to plaintiff because the money did not go directly into one of the companies, which increased his cash flow.

As to the value of the real estate, plaintiff presented a licensed real estate appraiser, who was qualified as an expert in commercial real estate valuation. He appraised the properties located at Clark Road, Cotluss Road, and South Corporate Drive.

Using the sales comparison approach, he valued Clark Road at $600,000. That property was encumbered by a $200,000 interest-only mortgage. He valued Cotluss Road using both a sales comparison approach and the income approach, and concluded the property should be valued at $1,335,000. The balance of the mortgage encumbering that property was $824,969 when the divorce complaint was filed, and $779,859.20 at the time of trial. The expert appraised South Corporate Drive at $934,000. The property had a mortgage of $599,979.06 at the time of the divorce complaint and $591,231.65 at the time of trial.[2]

A different expert, a certified residential appraiser who was qualified as an expert in appraising timeshare properties, observed that it was "almost impossible" for an individual to sell a timeshare. He appraised the parties' five-week interest in the Florida timeshare at $45,000 based on three comparable sales. The timeshare had a mortgage of $254,385.24 at the time of trial.

---

[2] As discussed below, at trial, the parties entered various stipulations that included their agreements as to the amount of the balance of each mortgage.

A-1578-16T2

Defendant presented five fact witnesses who offered testimony about the parties' relationship and their relationships with their children, including the parties' daughter, defendant's father and sister, and a family friend. Another witness explained that he was friends with the family, had purchased plaintiff's landscaping business, and worked with plaintiff in RER. His testimony focused on the manner in which plaintiff maintained two sets of accounting records, one for customers who paid using credit cards and the other for those who paid in cash.

On September 29, 2016, the court entered a dual judgment of divorce, accompanied by its comprehensive statement of reasons in which it made detailed findings as to all of the statutory factors relating to each of its decisions.

The court first granted plaintiff sole legal custody of the two sons with physical custody of the older son to plaintiff, and physical custody of the younger son to defendant. The court noted that it did not transfer physical custody of the younger son to plaintiff because plaintiff did not seek his custody. The court emancipated the parties' daughter effective September 1, 2016, but left open the possibility that she could be unemancipated if she attended college.

Next, the trial court addressed support. Using the court's guidelines for child support, it ordered plaintiff to pay defendant $224 per week in child

support for the younger son and defendant to pay plaintiff $380 per week in support for their older son. Thus, defendant would pay $156 per week in net child support to plaintiff until the older son was emancipated, after which time plaintiff would pay defendant $224 per week. The court explained that since this was the first time a support award was being ordered by the court for the children, the court "used the [guidelines'] teen adjustment because [the younger son was] currently over twelve years old."

After establishing the child support amount, the court addressed alimony. The court ordered plaintiff to pay defendant $2500 per week in alimony until the older son was emancipated, at which time the payment would be reduced to $1950 per week. The alimony obligation would last for seventeen years and five months, the length of the marriage.

The court turned to the Mallamo[3] adjustments sought by plaintiff and made detailed findings that led to its conclusion that plaintiff was entitled to a credit in the amount of $155,290 for overpayment of support pendente lite. The court offset that amount by $25,085.09, which it found plaintiff was obligated to pay pendente lite for certain expenses, but failed to do so.

---

[3] Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995).

A-1578-16T2

The trial court addressed ED by incorporating many of the same findings it stated when discussing support. The court considered the establishment and evolution of the parties' businesses and the acquisitions of their real estate and concluded that the assets should be apportioned equally between the parties. After accounting for various credits, the court awarded plaintiff the RER companies and the Clark Road, South Corporate Drive, and Florida timeshare properties. It awarded defendant the Cotluss Road property, which had equity of almost $510,030.97, and the Lake Mohawk lot. The court also ordered plaintiff to pay defendant $161,039.10 to make up the remainder of what she was due under ED.

Excluded from the calculation was the marital home. The court noted that neither party presented any expert testimony as to the Skyview Property's value. It ordered defendant to vacate the marital home so that it could be sold without interference, and granted plaintiff a limited power of attorney to have it listed and sold. The court required that upon sale, plaintiff was to pay from the proceeds the balance of the mortgage at the time the complaint was filed and then equally share with defendant any remaining proceeds.

The JOD directed the parties to file their applications for counsel fees post-judgment. However, as part of the JOD, the trial court required defendant

15

to reimburse plaintiff for $15,500.97 in fees he had paid for forensic accountants on her behalf, because they never produced reports.

After the submissions were made, on November 17, 2016, the court issued an order supported by a written decision that required defendant to pay plaintiff $2000 in attorneys' fees related to prior violations of litigant's rights and $2500 in expert fees incurred for the parenting coordinator. As indicated by the court, "this Order in conjunction with the Judgment of Divorce constitute a final Judgment effective the date of this Order."

Both parties filed motions for reconsideration of the JOD, including counsel fees. On December 2, 2016, the court entered an order partially granting and partially denying the parties' motions for reconsideration. The court awarded plaintiff an additional $1000 in attorneys' fees for defendant's failure to comply with the divorce judgment. These appeals followed.

II.

In our review, we defer to a trial court's factual findings, which "are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). We "do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Slutsky v. Slutsky, 451 N.J. Super. 332, 344 (App. Div. 2017) (quoting

Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)). This is particularly so in divorce proceedings because they "involve[] the Family Part's 'special jurisdiction and expertise in family matters,' which often requires the exercise of reasoned discretion." Ibid. (quoting Cesare, 154 N.J. at 413).

Our "[d]eference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Ibid. (alteration in original) (quoting Cesare, 154 N.J. at 412). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Cesare, 154 N.J. at 412 (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). Thus, we will not disturb a trial court's factual findings unless we are "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ibid. (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)).

### III.

We first address defendant's challenge to the trial court's custody determination. On appeal, she argues that the court's custody arrangement with

respect to the younger son was not in his best interests and was unworkable because although she is his custodial parent, she "is foreclosed from information or decision making regarding [his] health, education and welfare." She asserts that the court should have awarded joint legal custody because there was insufficient evidence to support its findings that she and plaintiff were incapable of communicating and cooperating with respect to the children and that she was attempting to alienate them from plaintiff. Defendant also argues that the court should have, sua sponte, interviewed both sons regarding their custodial preferences. We disagree.

In its written decision, the court reviewed each of the statutory factors under N.J.S.A. 9:2-4(c) relating to custody and made specific findings about the parties' relationship with their children and their ability to parent together. The court recognized that plaintiff and defendant had at one time agreed to a parenting plan when the divorce complaint was filed, and although it was never implemented, the court found that the agreement was evidence of each parent's willingness to accept custody. It found that plaintiff and defendant were unable to cooperate and that forcing them to communicate would be counterproductive.

The court ruled out an award of joint legal custody because it would not be in the best interests of the children. It also found that defendant "conduct[ed]

a malicious campaign" to alienate the children from plaintiff and that her "alienation tactics casts a giant shadow over the whole custody assessment." According to the trial court, since the parties' separation, defendant "perpetuated in the children's minds th[e] image of their father as a violent uncontrolled person," which was unsupported by the evidence.

Turning to the children's preferences, the court noted that the daughter did not want to see her father, the older son chose to live with his father, and as to the youngest child, he was living with his mother and having alternate weekends and a mid-week visit with his father without any problems.

We review a custody award under an abuse of discretion standard, giving deference to the court's decision provided that it is supported by "adequate, substantial, credible evidence" in the record. Cesare, 154 N.J. at 412. "[T]he decision concerning the type of custody arrangement [is left] to the sound discretion of the trial court[.]" Nufrio v. Nufrio, 341 N.J. Super. 548, 555 (App. Div. 2001) (second and third alteration in original) (quoting Pascale v. Pascale, 140 N.J. 583, 611 (1995)). Therefore, "the opinion of the trial judge in child custody matters is given great weight on appeal." Terry v. Terry, 270 N.J. Super. 105, 118 (App. Div. 1994). Nevertheless, "we must evaluate that opinion by

considering the statutory declared public policy and criteria which a trial court must consider[.]" Ibid.

Under the statutory factors, courts have discretion to order joint legal and physical custody, sole custody to one parent with parenting time for the other parent, or "[a]ny other custody arrangement as the court may determine to be in the best interests of the child." N.J.S.A. 9:2-4(a) to (c). The "paramount consideration" in determining custody "is to foster the best interests of the child." Beck v. Beck, 86 N.J. 480, 497 (1981). We generally "leave the decision concerning the type of custody arrangement to the sound discretion of the trial court[.]" Pascale, 140 N.J. at 611.

Joint custody requires that the parents "exhibit a potential for cooperation in matters of child rearing." Beck, 86 N.J. at 498. The parents do not need to have an "amicable relationship," but must "be able to isolate their personal conflicts from their roles as parents" and ensure "that the children be spared whatever resentments and rancor the parents may harbor." Ibid.

Our review of the record demonstrates that although not a usual result, the evidence supports the trial court's decision awarding plaintiff legal custody of the parties' sons and there is nothing in the record to indicate that the arrangement was contrary to their best interests. The court conducted an

extensive evaluation of the applicable factors set forth in N.J.S.A. 9:2-4, emphasizing the discord between the parties and defendant's attempts to alienate the children from plaintiff, which the court found prevented them from being able to maintain joint custody of their children. It made specific credibility findings and rejected defendant's denials and explanations for her conduct that was described in detail by other witnesses, including the parenting coordinator.

We reject defendant's contention that the trial court should not have reached its determination without interviewing the parties' sons. While it is true that when making a custody determination, "the preference of the children of 'sufficient age and capacity' must be accorded 'due weight,'" Beck, 86 N.J. at 501 (quoting N.J.S.A. 9:2-4), we discern no abuse in the court's discretion in not doing so here. See D.A. v. R.C., 438 N.J. Super. 431, 455 (App. Div. 2014) ("the decision whether to interview a child in a contested custody case is left to the sound discretion of the trial judge"). In this case, neither party asked for the interviews and there was no question as to the sons' preferences, as the trial court found that they "made their choices known" through their actions that included the older son leaving defendant's home to live with plaintiff, where he resided for over a year and a half before the trial, and the younger son living with defendant and visiting with plaintiff without incident.

21

We turn our attention to the issues raised about the court's child support award. Defendant contends that the court erred by calculating child support solely with reference to the Child Support Guidelines (Guidelines), Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, www.gannlaw.com (2019), even though the parties' combined net income was more than $187,200, the highest amount to which the Guidelines apply. Plaintiff acknowledges that the parties had a net combined income of more than $187,200, but argues that defendant waived this argument because she did not raise it at trial and, in any event, the court had discretion not to make a supplemental award above the amount contemplated by the Guidelines. We disagree with plaintiff.

A trial court has "substantial discretion" when making a child support award. Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Foust v. Glaser, 340 N.J. Super. 312, 315 (App. Div. 2001)). The court, however, must exercise its discretion in accordance with the law. Ibid. "If consistent with the law, such an award will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Ibid. (quoting Foust, 340 N.J. Super.

at 315-16).  "An abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  Ibid. (quoting Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002)).

Absent limited circumstances, parties by their conduct may not waive their children's right to support.  "The right to child support belongs to the child and 'cannot be waived by the custodial parent.'"  Pascale, 140 N.J. at 591 (quoting Martinetti v. Hickman, 261 N.J. Super. 508, 512 (App. Div. 1993)).  In other words, "the responsibility to support runs from parent to child, not parent to parent[.]"  Id. at 592.  A court must base its child support decision on an evaluation of the child's needs and interests, not on the parents' conduct.  Id. at 591.

As already noted, the trial court conducted a detailed analysis of the statutory factors relating to an award of child support under N.J.S.A. 2A:34-23.  However, it did not address the Guidelines' requirements for parents with a combined net income of more than $187,200.  When confronted by an above-the-Guidelines income, a "court shall apply the [G]uidelines up to $187,200 and supplement the [G]uidelines-based award with a discretionary amount based on the remaining family income (i.e., income in excess of $187,200) and the factors

specified in N.J.S.A. 2A:34-23." Child Support Guidelines, Pressler & Verniero, <u>Current N.J. Court Rules</u>, Appendix IX-A to <u>R.</u> 5:6A, www.gannlaw.com (2019); <u>see also</u> <u>Caplan v. Caplan</u>, 182 N.J. 250, 271 (2005).

In considering the above-Guidelines amount, the law calls for the court to "consider the factors set forth in N.J.S.A. 2A:34-23(a) to determine the amount of the supplemental support award and then combine that amount with the [G]uidelines-based award." <u>Caplan</u>, 182 N.J. at 271. "'[T]he dominant guideline for consideration is the reasonable needs of the children, which must be addressed in the context of the standard of living of the parties. The needs of the children must be the centerpiece of any relevant analysis.'" <u>Strahan v. Strahan</u>, 402 N.J. Super. 298, 307 (App. Div. 2008) (quoting <u>Isaacson v. Isaacson</u>, 348 N.J. Super. 560, 581 (App. Div. 2002)).

Here, the court did not apply the law in its calculation of child support. It neither calculated a supplemental amount for support nor did it explain why it did not follow the requirements for high-income families. Under these circumstances, we are constrained to remand for reconsideration of child support to determine the amount of a supplemental award, if any. <u>See</u> <u>Elrom v. Elrom</u>, 439 N.J. Super. 424, 443 (App. Div. 2015).

Next, we address both parties' challenges to the trial court's alimony determinations. Defendant argues that the court erred by ordering a reduction in her alimony after their older son is emancipated and in relying upon plaintiff's CIS for the parties' marital lifestyle. Plaintiff argues on cross-appeal that the court erred because it failed to consider the income defendant will receive from the Cotluss Road property, which it awarded to her in ED. We find no merit to these contentions.

In determining an award of alimony, the trial court considered the factors under N.J.S.A. 2A:34-23B and made specific findings as to each. While addressing alimony, the trial court also made specific credibility findings. The court found that defendant had "credibility issues throughout the entire trial." It stated that "[t]here were constant issues of [defendant] testifying one way and then being impeached by her own deposition testimony when she was being cross examined." In addition, "[s]he could not remember virtually anything that had occurred as much as four or five years previously when questioned by plaintiff's attorney. Yet on direct testimony she was able to describe in great detail things from twenty years ago." The court devoted two pages to addressing defendant's credibility, giving examples and adding that it "could go on for

pages about the gaps in [defendant's] credibility . . . ."  For these reasons, when addressing the parties' standard of living, the court gave "little credence" to the information provided by defendant.  For instance, she testified that her credit card expenses were $5000 to $7000 per month, but the billing statements showed expenses closer to $4000.  The court therefore relied on plaintiff's CIS for the standard of living.

The court recognized that the various businesses and properties it allocated through ED "might be liquidated or sold to provide investment income going forward."  The court, however, "expect[ed] that much of what is liquidated will be exhausted on attorneys' fees and experts' fees."

In its calculation of alimony, the trial court imputed $300,000 in income to plaintiff, and $27,040 to defendant.  As to defendant, the court found that she was underemployed, "not really gainfully employed," while working twenty-five hours per week, making $13 per hour.  Nevertheless, it used that hourly rate for a forty-hour week, fifty-two weeks per year, to establish her imputed income.

In determining plaintiff's income, the court found that the CPA "understated" plaintiff's average income at $230,000.  The court found that although plaintiff's average income on his 1040 forms for 2012 to 2014 was $226,280, the businesses also paid personal expenses, and he might have

received unreported income as cash. The court explained that plaintiff's initial CIS pegged the family's marital expenses at $17,218 per month, equal to $206,616 per year, which the court determined would require income close to $300,000 per year. The court credited plaintiff's and the CPA's testimony that the companies had little debt prior to the pendente lite order, meaning that plaintiff's income was sufficient to cover the marital expenses. Based on that reasoning, which was supported by the CPA's cash flow analysis, the court imputed income of $300,000 to plaintiff.

The court concluded that defendant needed alimony and plaintiff had the ability to pay. It ordered plaintiff to pay defendant $2500 per week in alimony, equal to $130,000 per year. The court explained that after combining the alimony payment with defendant's imputed income, accounting for taxes and child support, defendant would have net income of $2044 per week, which was equal to $8857.33 per month or $106,288 per year. Comparing that sum with her monthly expenses of $9515 would leave her "short" $657.67 per month. With respect to plaintiff, his net income, after accounting for child support and alimony payments, would be $2316 per week, totaling $10,036 per month or $120,432 per year. Comparing that amount with his monthly expenses of

$10,691 would leave plaintiff "short" $655 per month. The court advised that it did "the best it [could] to place the parties in equipoise."

The court further explained that "[i]t would be inequitable for [defendant] to continue to receive $2500 once [the older son] is emancipated . . . ." At that point, defendant's weekly net income would be $2424 per week, or $10,504 per month, almost $1000 more than her expenses. Thus, the court ordered a reduction in the weekly alimony payment to $1950 after the older son's emancipation. At that time, defendant's weekly net income would be $2123, equivalent to almost $9200 per month, leaving her "short" $315 per month. Plaintiff, by contrast, would be "short" $275. Again, the court explained that the alimony reduction would put the parties "in substantial equipoise." Thus, accounting for alimony and child support, plaintiff was obligated to pay defendant $2344 per week until their older son was emancipated. After his emancipation, plaintiff's alimony payment would be reduced to $1950 per week, plus $284 per week in child support for the younger son, for a combined payment of $2234 per week. The court determined that defendant was entitled to alimony for a length of time equal to the duration of the marriage, seventeen years and five months, beginning at the time of the first pendente lite payment in February 2013 and continuing through July 2030.

28

In our review of an alimony award, we defer to a trial court's findings as long as they are supported by substantial credible evidence in the record. Reid v. Reid, 310 N.J. Super. 12, 22 (App. Div. 1998). Applying that standard here, we find no reason to disturb the trial court's alimony award.

"Alimony relates to support and standard of living; it involves the quality of economic life to which one spouse is entitled, which then becomes the obligation of the other." Gnall v. Gnall, 222 N.J. 414, 429 (2015). "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation. The supporting spouse's obligation is set at a level that will maintain that standard." Innes v. Innes, 117 N.J. 496, 503 (1990) (citation omitted).

Alimony awards are governed by N.J.S.A. 2A:34-23(b), which sets forth a list of non-exhaustive factors for a court to consider. If the court determines that one factor is more or less relevant than the other factors, or that one factor should be elevated over another factor, the court must "make specific written findings of fact and conclusions of law" in that regard. N.J.S.A. 2A:34-23(b).

Initially, as we observed earlier, the trial court here conducted an exhaustive analysis of the statutory factors. Although defendant argues that the trial court did not properly evaluate the parties' standard of living on appeal, she

concedes that the $2500 initial alimony award is appropriate. In doing so, she also admits that after her child support obligation for her older son ends, the alimony amount will exceed her requirements for support.

In any event, as to defendant's challenge to the trial court's reliance upon plaintiff's CIS, we are satisfied that court fully explained that it relied on plaintiff's CIS because of defendant's credibility issues. Indeed, the court found that defendant overstated her credit card expenses in an apparent attempt to overstate the marital standard of living, which was already substantial.

Turning to plaintiff's contention that the court erred by failing to consider in its alimony calculation the income that defendant would receive from tenants to the Cotluss Road property, we conclude it is unsupported by any evidence that such income existed. Plaintiff relies exclusively on his expert's appraisal, arguing that it shows that the Cotluss Road property generates approximately $164,169 in rental income per year, requires $51,541 to maintain and operate, and therefore has a net operating income of over $104,000. After accounting for the approximately $63,401 per year in mortgage payments, plaintiff contends that defendant should have a net income from the property of just over $41,018.

Plaintiff first raised this issue in his motion for reconsideration, which the court rejected. In its oral decision, the court explained that at trial, plaintiff

"minimized the income received from the property." For instance, plaintiff's expert "indicated the cash flow income [from the property] was de minimis." Moreover, citing Steneken v. Steneken, 183 N.J. 290 (2005), the trial court noted that because plaintiff's real estate appraiser used an income approach to appraise the property, there was a question "whether income used in calculating a value of a property for equitable distribution should be used again in a calculation of alimony." The court concluded:

> If, in fact, it is shown down the road that defendant has income from her operation of . . . Cotluss Road, it may be a basis for a prayer for modification, but the Court actually does not expect her to operate the property, but expects that she's going to sell it. Even if she doesn't, though, it's premature.

We agree with the trial court's conclusion. Moreover, we observe that plaintiff's expert's cash flow analysis stated that plaintiff had no net income from the property in 2012 and 2013. The expert explained that there was income in 2011, but it was due primarily to pre-existing cash in the bank and money borrowed when the mortgage was refinanced, not from rental income. The

31

testimony of plaintiff's own expert established that the Cotluss Road property generated little or no rental income.[4]

## VI.

We next focus on the parties' challenges to the trial court's ED determinations. Defendant argues that the court erred by: (1) denying her the opportunity to present expert testimony on the valuation of the businesses; (2) awarding plaintiff Mallamo credits for pendente lite support; (3) requiring her to assume any of the debt associated with the timeshare in Florida; and (4) finding that she took $60,000 out of the basement safe. On cross-appeal, plaintiff argues that the court erred by failing to provide him with a credit for his pay down of the mortgage on the Cotluss Road property. He also argues that the court erred by failing to provide him with a credit for the cost of repairs to the marital home and failing to require defendant to share any loss from the sale of the house.

---

[4] In the supplemental appendix plaintiff filed with his reply brief, he includes post-trial certifications defendant filed with the trial court in which she stated that the Cotluss Road property generated income. Defendant, in her reply brief, argues that the property was in disrepair and that she had to expend significant funds to upgrade it and to refinance the mortgage on the property as plaintiff requested; she includes in her supplemental appendix pictures of the property and invoices that were not part of the trial record. The arguments advanced in the parties' reply briefs are based on materials in the supplemental appendices that were not before the trial court; therefore, they are not considered on appeal.

We begin our review of the ED award by addressing defendant's contention about the trial court barring her from producing an expert. We discern the following facts from the record.

On September 4, 2015, the court barred plaintiff from presenting a forensic accountant. The court explained that it "reluctantly" entered the order after "having given the defendant multiple opportunities to provide a valid expert report on the issue of the business valuation only to have her present in the summer of 2015 a document the [c]ourt concluded was nothing more than a net opinion."[5]

The "multiple opportunities" began early in the matter. Throughout the pendency of the matter, the trial court entered orders enabling plaintiff to pay for an expert, as long as defendant retained an expert with courts approval. The court made clear that defendant was free to retain an expert of her choosing, but if she wanted plaintiff to advance sums for that purpose, she had to make application to the court. Rather than follow the court's procedure, in 2013, defendant chose to retain unilaterally her own forensic accountant, and paid him

---

[5] Although defendant refers to the court's comment in her appellate brief, she does not set forth any argument about why the court was wrong, nor did she provide us with a copy of the report in her appendix.

a $5000 retainer. She then filed a motion seeking reimbursement from plaintiff, which the court denied.

By May 2015, defendant did not serve an expert report. On May 3, 2015 and May 29, 2015, the court entered orders requiring defendant to provide plaintiff with her expert's report by July 3, 2015. Despite having paid the expert $9000, defendant retained a new expert to replace him and paid another $5000 retainer. Yet, defendant never produced a report.

Under these circumstances, we find no abuse of the trial court's discretion in barring defendant from relying upon expert testimony. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371-72 (2011). Even if we did, we would find the error harmless. R. 2:10-2. The trial court's reliance on plaintiff's experts was more prejudicial to plaintiff than defendant. If defendant was correct, the court's reliance on plaintiff's experts' values resulted in plaintiff receiving overvalued assets in satisfaction of his ED award. For example, plaintiff's CPA valued the business at $656,000, which was higher than the value purportedly ascribed by defendant's own expert. Similarly, if defendant is correct that $1,335,000 was a "low-ball" value for Cotluss Road, that valuation also benefitted her because the court awarded her that property in ED.

Moreover, plaintiff has produced no evidence in the record that she suffered any harm.

B.

Next, we address defendant's contention that the court erred by providing plaintiff with a Mallamo credit for overpayment for pendente lite support. In Mallamo, we explained that pendente lite support awards may be entered based upon the parties' submissions without a plenary hearing, and are subject to modification prior to final judgment based on the actual evidence adduced at trial. Mallamo, 280 N.J. Super. at 12. Defendant claims that the court based its decision to award plaintiff Mallamo credits on its misunderstanding of the shareholder loans plaintiff took out from the businesses. We disagree.

Contrary to defendant's contention, the court did not base its decision on the loans. In fact, in its decision, the court indicated that it was not awarding plaintiff any credit for the shareholder loans specifically because it awarded him Mallamo credits. Instead, under Mallamo, the court found that plaintiff had overpaid defendant's pendente lite support based on the evidence adduced at trial about the marital lifestyle, defendant's needs, and plaintiff's ability to pay. As explained by plaintiff and his expert, the loans were taken so that plaintiff could pay support for defendant and the children pendente lite, as well as to pay his

35

own expenses, which included his legal fees.  Defendant's arguments that somehow the true nature of the loans were hidden or disguised are simply without any merit.

C.

We turn to the parties' contentions about the errors made by the trial court in distributing their property.  At the outset, we acknowledge that "[a] Family Part judge has broad discretion . . . in allocating assets subject to equitable distribution."  Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012).  We will "reverse only if we find the trial judge clearly abused his or her discretion, such as when the stated 'findings were mistaken[,] . . . the determination could not reasonably have been reached on sufficient credible evidence present in the record[,]' or the judge 'failed to consider all of the controlling legal principles[.]'"  Id. at 72 (alterations in original) (quoting Gonzalez-Posse v. Ricciardulli, 410 N.J. Super. 340, 354 (App. Div. 2009)).

In its calculation of the properties' values, the trial court applied various stipulations that the parties agreed to pre-trial.  Those stipulations included the following facts: the Lake Mohawk lot was worth $6500; the Florida timeshare had a mortgage of $273,000 at the time of the complaint, which plaintiff paid down to approximately $254,385 during litigation; the Clark Road property

36

owned by CRR was encumbered by a $200,000 mortgage; the Cotluss Road property had a mortgage of approximately $824,969[6] as of the date of the complaint; and the South Corporate Drive property had a mortgage balance of approximately $599,979 at the time of the complaint that plaintiff paid down during litigation to $591,232.

In determining the properties' values, the court relied solely upon plaintiff's experts' testimony as defendant did not present any evidence to refute their opinions. As a result, it determined the timeshare's value was $45,000; the Clark Road property's value was $400,000; the Cotluss Road property's was $510,000; and South Corporate Drive was $934,000.

In determining the parties' businesses' values, the court accepted the CPA's $656,000 valuation of the two RER companies, though the court found the valuation "suspect" because it was done for negotiation purposes. The court found it significant and "somewhat astounding" that on cross-examination, defendant's counsel elicited testimony from the CPA that defendant's forensic

---

[6] Plaintiff argued that he was entitled to a credit for paying down the mortgage during litigation, but the court did "not recall the evidence that support[ed] the pay down amount and the stipulation only ha[d] the amount of the mortgage as of the date of the complaint."

accountant, who did not testify, agreed with him that the RER companies should be valued at $600,000.

The trial court calculated and applied credits to which plaintiff was entitled before reaching a bottom line as to ED. Among them was the Mallamo credit in the net amount of approximately $130,205, and a credit for $30,000 for one-half the $60,000 the court found defendant took from the safe in the basement. The court also credited plaintiff approximately $15,500 for money he paid to the court-appointed forensic accountant on defendant's behalf and to defendant's forensic accountant directly, neither of whom produced a report.

The court then apportioned all assets equally between the parties. It added up the net value of all of the properties and businesses and divided that amount in half, finding that each party was entitled to the equivalent of $953,275.95. Next, it subtracted $100,000 from defendant's portion, representing her share of the negative equity in the Florida timeshare. It further subtracted from her share the various credits owed to plaintiff. Accounting for those adjustments, defendant was due the equivalent of $677,570.07 in ED.

In a divorce judgment, courts are directed to "effectuate an [ED] of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage." Steneken, 183 N.J. at 299 (quoting

Painter v. Painter, 65 N.J. 196, 205 (1974)). The goal of ED "is to effect a fair and just division of marital [property]." Elrom, 439 N.J. Super. at 444 (alteration in original) (quoting Steneken, 183 N.J. at 299). Courts must "identify the marital assets, determine the value of each asset, and then decide 'how such allocation can most equitably be made.'" Ibid. (quoting Rothman v. Rothman, 65 N.J. 219, 232 (1974)).

Under N.J.S.A. 2A:34-23.1, courts are required to make "findings of fact on the evidence relevant to all issues pertaining to asset eligibility or ineligibility, asset valuation, and [ED]" after considering the factors delineated in the statute.

Florida Timeshare

Defendant asserts that the court erred by awarding plaintiff the Florida timeshare and requiring her to contribute $100,000 towards the outstanding mortgage and at the same time depriving her of the use of the timeshare. We disagree.

As already noted, before trial, the parties stipulated to the mortgage balance on the timeshare. Plaintiff's expert appraised the five-week timeshare interest at $45,000, so it had negative equity of $209,385.24. In its ED award, the court calculated the equity in the timeshare by subtracting the amount of the

outstanding mortgage from the value of the property, an approach that defendant does not question for any of the other properties. The only difference was that the mortgage on the timeshare was higher than its appraised value, so whichever party received the timeshare was entitled to a credit from the other party for half the amount of the negative equity. Because the court awarded the timeshare to plaintiff, he was entitled to the credit.

We find no merit to defendant's contention that since she had to contribute to the debt, she should be allowed to use the timeshare. First, at trial, plaintiff testified to the significant expenses required to use the timeshare over and above the mortgage payments, including approximately $20,000 per year in dues, plus an additional $24,000 for activities and food. The fact that the mortgage was netted out from the value and defendant had to share in the negative equity did not give rise to a right to use the distributed property, especially without sharing in its expenses. Second, and more important, "[i]t seems almost doctrinal that the elimination of the source of strife and friction is to be sought by the judge in devising the scheme of [equitable] distribution, and the financial affairs of the parties should be separated as far as possible." Bowen v. Bowen, 96 N.J. 36, 41 (1984) (quoting Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443 (App. Div.

1978)). Defendant's argument, if accepted, would insert plaintiff and defendant back into each other's financial affairs, which ED was intended to eliminate.

## The Safe

Defendant argues that there was insufficient evidence to support the court's finding that she took $60,000 from the safe in the basement, and that the court therefore erred by awarding plaintiff a credit of $30,000.

We conclude that defendant's argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). Suffice it to say, the trial court did not abuse its discretion in relying upon the evidence it found credible rather than accepting defendant's inconsistent explanations about the money in the safe. The court's credibility determinations were supported by credible evidence, and there is no basis to question them on appeal.

## Cotluss Road Property Mortgage Pay Down

On cross-appeal, plaintiff contends that the court erred by not granting his motion for reconsideration and amending the judgment to account for a $60,057.23 reduction of the mortgage on the Cotluss Road property during litigation. Plaintiff argued that he was entitled to a credit for paying down the mortgage during litigation.

The trial court did "not recall the evidence that supports the pay down amount and [noted that] the stipulation only has the amount of the mortgage as of the date of the complaint." The court also stated there was no testimony at trial about the reduction, as confirmed by the fact that plaintiff, who now had the benefit of the trial transcripts, could "not reference a transcript page with any information regarding the issue." The court acknowledged that plaintiff identified "footnote 12 of 18 footnotes on the case information statement[ t]o reach his final number of $60,[0]57.23, [and that plaintiff] attaches a document not part of the trial record," but refused to accept that as evidence adduced at trial since there was no testimony about either.

A motion for reconsideration is governed by Rule 4:49-2 and "is a matter within the sound discretion of the [c]ourt, to be exercised in the interest of justice." D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990). Litigants "should not seek reconsideration merely because of dissatisfaction with a decision of the [c]ourt." Ibid. Instead,

> [r]econsideration should be utilized only for those cases which fall into that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence.
> [Ibid.]

On reconsideration, a litigant must specify "the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred[.]." R. 4:49-2. Reconsideration "cannot be used to expand the record . . ." Capital Fin. Co. of Del. Valley v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008). It is "designed to seek review of an order based on the evidence [that was] before the court . . . , not to serve as a vehicle to introduce new evidence in order to cure an inadequacy in the . . . record." Ibid. The court may consider new evidence "in the interest of justice" only if it "could not have [been] provided on the first application[.]" D'Atria, 242 N.J. Super. at 401.

We conclude that the trial court was incorrect in denying reconsideration. During trial, plaintiff testified that as of September 2015, the mortgage on the Cotluss Road property was $779,859.20, and referenced a bank statement attached to his CIS that showed the amount outstanding on the loan. The amount was $45,109.83[7] less than the stipulated amount that existed at the time plaintiff

_____

[7] Neither plaintiff's testimony, nor the CIS and bank statements, however, supported his claim that he paid the Cotluss Road mortgage down by $60,057.23. The evidence only supported a pay down amount of $45,109.83. Although plaintiff attempted to justify the higher amount by attaching the bank statement from July 2016, that document was not part of the record at trial. Plaintiff may not introduce new evidence on a motion for reconsideration that he could have introduced at trial. Asterbadi, 398 N.J. Super. at 310.

filed his complaint. Plaintiff further testified at trial, referring to his CIS, including footnote twelve, that the property was worth approximately $555,141, representing the $1,335,000 "appraised value of the property net of the mortgage balance of seven seventy-nine eight fifty-nine." Thus, there was testimony highlighting plaintiff's contention and documentary evidence, consisting of the CIS and attached bank statement, which were admitted into evidence. Since the court inadvertently overlooked the evidence, it should have granted that aspect of plaintiff's motion for reconsideration. For that reason, we must remand the matter for the court to recalculate the ED net amount owed by plaintiff to defendant.

### Repairs and Sale of Marital Home

Plaintiff contends that reconsideration was also improperly denied because he was entitled to a credit for repairs to the marital home and that the court should have apportioned half of any loss from the sale of the house to defendant. On appeal, he claims, without any evidentiary support, that at the recommendation of the realtor he spent $60,000 to repair the marital home. Plaintiff also includes in his appendix the Closing Settlement Statement (HUD-1 form) from the November 3, 2017 sale of the Skyview Property, indicating its sale for $910,000.

We conclude that plaintiff's contention that he is now entitled to repair credits under the JOD is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We only note that we agree with the trial court that at trial, plaintiff "provide[d] no information" or "evidence" about any repairs to the house. Moreover, at the time of reconsideration, there was no evidence that any actual repairs had been made or were needed in order to sell the house. His motion was inappropriate for reconsideration and premature.

## VII.

Defendant and plaintiff both challenge the court's ruling on counsel fees. Defendant argues that the court erred by failing to require plaintiff to pay her legal fees and by ordering her to pay a portion of his legal fees due to her violations of litigant's rights. Plaintiff argues on cross-appeal that the court erred by failing to order defendant to pay him additional attorneys' fees because of her bad faith litigation tactics throughout trial. We disagree with both parties' contentions.

During the course of the litigation, the trial court entered orders at various points requiring defendant to pay plaintiff's counsel fees totaling approximately $4500, attributable to her failure to abide by court orders. On November 17,

2016, the court entered a supplemental order on counsel fees that awarded plaintiff $2000 in additional fees.

In the trial court's statement of reasons accompanying its November 16 order, the court explained that it was "unfortunate" that the parties incurred legal fees approaching one million dollars, but "not surprising due to the level of hostility." The court stated it was "loathe to shift fees based upon unreasonableness of positions alone when both parties contributed to negotiation stalemates." It rejected both parties' requests for additional attorneys' fees. It found the award of any additional fees to either party "problematic" because they both took unreasonable positions and would be "hard pressed" to pay their own legal fees.

The court was also troubled by the "disparity in hours and fees disproportionately heavy for plaintiff," observing that defendant retained four different attorneys, and they billed for approximately 644 hours of time, while plaintiff retained two attorneys, who billed approximately 2180 hours. Defendant's attorneys charged in the range of $185 to $375 per hour, and plaintiff's attorneys charged in the range of $250 to $550. Plaintiff incurred approximately $740,000 in attorneys' fees, and defendant incurred approximately $230,000. Plaintiff paid his attorneys almost $400,000, and

would "struggle to pay [defendant's] Court ordered support and then the balance of his fees."  Defendant paid approximately $75,000, and would "struggle to pay the unpaid portion of her fees and repay the loans" provided by her father. However, the court found that defendant was partially responsible due to her bad faith tactics, which included alienating the children, violating court orders, and consistently retaining new counsel.  The court consequently awarded plaintiff an additional $2000 in counsel fees, and indicated that it would have assessed more if plaintiff had been able to document his additional fees that were attributable to defendant's conduct.  The court also ordered defendant to pay $2500 for the parenting coordinator's fees.

We defer to a trial court's determination on counsel fees in a matrimonial action, and will only disturb it "on the 'rarest occasion,' and then only because of clear abuse of discretion."  Strahan, 402 N.J. Super. at 317 (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

A trial court may award reasonable attorney's fees in actions in the Family Part.  N.J.S.A. 2A:34-23; R. 5:3-5(c); see also R. 4:42-9.  When deciding if attorney's fees should be awarded, "the court must look at the requesting party's need, the other party's ability to pay and the good and bad faith of each party." Heinl v. Heinl, 287 N.J. Super. 337, 349 (App. Div. 1996).

47

Rule 5:3-5(c) also provides that:

> the court should consider, in addition to the information required to be submitted pursuant to R[ule] 4:42-9, the following factors: (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

Applying these guiding principles, we conclude that the parties' arguments about counsel fees are without merit and that the trial court did not abuse its discretion in limiting the award of counsel fees in this matter, substantially for the reasons expressed by the court in its statement of reasons.

VIII.

In sum, we affirm almost every aspect of the trial court's thoughtful determinations. We are constrained to vacate its award of child support and remand for recalculation using above-the-Guidelines considerations. We also vacate the ED award of the net amount payable by plaintiff to defendant and direct that the amount be reduced by one half of the reduction in the Cotluss Road property or $22,555.

Affirmed in part; vacated and remanded in part for further proceedings consistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION