**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0068-18T3

N.M.,

     Plaintiff-Appellant,

v.

J.M.,[1]

     Defendant-Respondent.

_____

       Submitted November 12, 2019 – Decided April 17, 2020

       Before Judges Rothstadt, Moynihan and Mitterhoff.

       On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FM-15-1431-13.

       Adinolfi, Molotsky, Burick & Falkenstein PA, attorneys for appellant (Julie Roberson Burick, of counsel and on the briefs; Kevin A. Falkenstein, on the briefs).

       Pavliv & Rihacek, LLC, attorneys for respondent (John T. Rihacek, of counsel and on the brief).

---

[1] To protect the identities of the parties' children, we refer to the parties by their initials and to the children as the daughter and the son throughout this opinion.

PER CURIAM

Plaintiff N.M. appeals from paragraph two of a July 26, 2018 order, which provides that she and defendant J.M. shall continue to have joint legal custody of their two minor children. This matter has a long and tortured history that ultimately led to a plenary hearing to determine, among other things, whether plaintiff should have sole legal custody of the parties' children. After hearing testimony from the parties and their children, the judge found that there was "no reasonable prospect within the foreseeable future that the parties will be able to agree, communicate and cooperate," and the parties failed to appreciate that this issue negatively impacted their children. The judge applied the appropriate statutory factors and concluded that based on the law, joint custody appeared to be "totally inappropriate." Yet, he ordered that the parties continue to have joint custody because he worried that awarding plaintiff sole custody would further erode defendant's relationship with the children.

On appeal, plaintiff argues that the order for joint legal custody is not supported by the judge's findings. We agree. Accordingly, we reverse paragraph two of the July 26, 2018 order and remand to the Family Part for entry of an order awarding plaintiff sole legal custody of the parties' children.

A-0068-18T3

We discern the following facts from the record. During the parties' marriage, they had two children: a daughter, born in 2003, and a son, born in 2007. In January 2011, the parties were divorced in the State of Nevada. The divorce decree recognized the parties' intent to relocate to the State of New Jersey. Plaintiff was permitted to immediately move to New Jersey with the children, and defendant planned to follow. If defendant failed to relocate, plaintiff would become the children's primary physical custodian. The divorce decree further revealed the parties' intent to share "equal or close to equal [parenting] time . . . with the children."

Ultimately, plaintiff permanently relocated to New Jersey but defendant did not. According to defendant, he moved to New Jersey in February 2011 and shared a home with a friend, but he returned to Nevada during the summer of 2012 to work on his Nevada property, although he still kept his New Jersey home. Therefore, under the terms of the divorce decree, plaintiff became the primary physical custodian, and on September 25, 2012, the Eighth Judicial District of the State of Nevada entered a stipulation and order to that effect. The order also detailed defendant's parenting time schedule and addressed matters related to communication between the parties and their children and the care and

support of their children. Less than a year later, New Jersey assumed jurisdiction over the matter.

Throughout 2014 and 2015, the Family Part entered numerous orders addressing defendant's parenting time, which included placing limitations on it. For example, the parties' daughter was not allowed to stay overnight at defendant's New Jersey home, and certain individuals were not permitted to be around when defendant had parenting time with the children. In addition, defendant was not permitted to use marijuana, even for medical purposes, for a specified period of time before his parenting time with the children. Accordingly, he was required to undergo hair follicle testing before and after his parenting time.

On September 11, 2015, a judge issued an order setting forth a telephonic communication schedule for defendant and the children, allowing fifteen-minute phone calls, three days a week and ordering plaintiff to record the conversations. The judge also instructed both parties to refrain from discussing the litigation with their children and making negative comments to the children about the other parent.

On October 21, 2015, the judge issued two more orders. The first order provided additional instructions about defendant's parenting time and hair

follicle testing. The judge also restricted defendant from being present in plaintiff's neighborhood, other than during scheduled parenting time. The second order further addressed defendant's parenting time schedule, requiring that parenting time be supervised by defendant's girlfriend, and it directed defendant to cease making negative and inappropriate comments to the children about plaintiff or risk termination of joint legal custody. The judge also appointed a guardian ad litem (the guardian) to "review the matter with regard to parenting time and issues between the parties." On March 21, 2016, the guardian submitted his report to the judge after interviewing the parties, the children, plaintiff's husband, and the daughter's therapist.

On June 28, 2016, the judge entered another order addressing defendant's parenting time. Defendant, while not in compliance with prior orders, was permitted parenting time at that time because he was in New Jersey. The judge again ordered defendant to cease speaking about plaintiff with the children or risk suspension of parenting time. The judge further ordered defendant to notify plaintiff of any medical issues with the children that arose during his parenting time and reminded him to refrain from using alcohol or drugs during his parenting time.

A-0068-18T3

In December 2016, the parties' daughter suffered a breakdown and was involuntarily committed an inpatient facility called the Carrier Clinic, pursuant to court order. The need for a court order arose because defendant would not consent to the daughter's commitment. Within a week, plaintiff was granted authorization to make medical decisions for the daughter. Regarding visitation at the hospital, both parties were ordered to comply with the treating physicians' recommendations.

The following January, defendant's parenting time with both children was suspended. In May 2017, a different judge maintained that this suspension was proper, after defendant's hair follicle tests produced "exceptionally high" results. The judge also set a schedule for defendant to Skype with the children three days a week.

On July 17, 2017, plaintiff moved for sole legal custody. The parties again appeared before a different judge, who denied plaintiff's motion, as a plenary hearing was necessary to consider the children's best interests.

On October 23, 2017, the judge entered an order providing for continued suspension of defendant's parenting time after he appeared at the daughter's school, prompting a police response to the daughter's school and a lockdown at both children's schools.

A-0068-18T3

In February 2018, plaintiff again moved for sole legal custody of the children. A plenary hearing was held before a new judge on March 12, May 29, July 16, July 17, and July 26, 2018. The judge heard testimony from plaintiff, defendant, and the daughter's counselor, and he conducted an in camera interview of the parties' children. The judge did not allow the guardian to testify, although he did read the guardian's report.

Plaintiff testified that after the parties' divorce, she remarried and had a third child with her husband. She has been a stay-at-home mom for years and spends her days caring for the children and supporting the household, by getting the children ready for school and extracurricular activities, preparing meals, cleaning the house, and helping with homework, among other things. When the children have misbehaved, she admitted to yelling at them and taking away privileges, such as technology. Overall, she testified, both children are healthy and doing well academically.

Because plaintiff felt that she was "the only one that has taken . . . responsibility," and she has been "the foundation for [the children]," being awarded sole custody would be best for the children. However, she believed that allowing defendant parenting time would be beneficial. Further, such an

A-0068-18T3

arrangement would be best because everything is "a fight" with defendant, and he "refuses to put the children first."

Plaintiff identified various instances where the children returned to her in need of medical attention that defendant failed to seek. For example, in August 2010, the daughter returned to plaintiff in need of treatment for a staph infection, and in November 2011, she returned to plaintiff with a broken toe. In the spring of 2016, while the children were visiting defendant in Nevada, the son returned to plaintiff with a sinus infection and infection in his genitals. According to plaintiff, during this visit, the daughter told her that the son was sick, so plaintiff texted defendant, telling him that the son needed medical care. However, defendant blamed plaintiff for the son's infection and decided that seeking medical care was unnecessary.

Similarly, with respect to the daughter's breakdown during December 2016, defendant refused to consent to the daughter's commitment to the Carrier Clinic. In late December, the daughter told plaintiff that she planned to run away to Mississippi to be with a person named Ryker, whom she had met on the Internet. Plaintiff immediately called PerformCare, a state agency that assists families with children in distress, and they recommended that plaintiff take the daughter to the psychiatric emergency services unit at Community Medical

8

Center.  There, a nurse advised plaintiff that the daughter needed to transfer to an inpatient facility, and when plaintiff informed defendant, he would not consent.  Plaintiff testified that a transcript of the daughter's phone conversation with defendant about Ryker, while she was committed, showed that defendant hinted to the daughter that if she lived with defendant, the rules would be different.  Plaintiff also stated that while defendant was visiting the daughter at the Carrier Clinic, she and defendant discussed the Ryker situation, and defendant suggested that plaintiff call Ryker.

Plaintiff also testified that defendant often failed to ensure that the children felt safe under his care.  For example, in the summer of 2014, after the children returned from visiting defendant in Nevada, the son told her that another child pinned him to the ground, put a dirty sock in his mouth, and tried to wrap him in duct tape.  According to plaintiff, when she reported this to defendant, he "didn't believe or just disregarded it as if it didn't happen."  Later that month, while the children were spending time at defendant's New Jersey home, the daughter reported that one of defendant's friends saw her while she used the bathroom.  Plaintiff stated that the daughter did not feel comfortable staying overnight at defendant's home because there were so many people coming and going.  As a result of these incidents, court orders were issued,

restricting the children's contact with the alleged offending individuals and providing that the daughter was not allowed to sleep overnight at defendant's New Jersey home.

In addition to plaintiff's opinion that defendant continuously failed to ensure the children's well-being, plaintiff testified that defendant constantly undermined her parenting efforts. When the children would return home from visiting defendant, at times they would act defiant, claiming that defendant told them they need not listen to plaintiff and that he would speak negatively about her. Defendant also often told the children that if they lived with him, the rules would be different. For example, after the children returned from spending time with defendant in Nevada during the summer of 2015, plaintiff felt that she could not manage her daughter's behavior, so she called PerformCare and was directed to enroll the daughter in GenPsych, a therapeutic counseling service.

Additionally, plaintiff testified that defendant often fails to comply with court orders and impedes the parties' ability to effectively communicate about their children. She stated that he constantly blames her for the children's problems, and he fights her or ignores her when she wants to do something for the children. Overall, she felt that his behavior hurt the children and contributed to their lack of interest in maintaining and improving their relationship with him.

A-0068-18T3

Before hearing from defendant, the judge heard from April Chillemi, a licensed clinical social worker who served as a counselor to the parties' daughter. During April 2017, the daughter requested to arrange a meeting with defendant. Chillemi testified that on the morning of the meeting, defendant requested to bring his girlfriend. Chillemi believed it was not in the daughter's best interests, so she canceled the meeting. Later that day, she received sixteen phone calls and voice messages "from a Nevada prefix." The first message identified the caller as defendant. Chillemi could not identify the caller that left the subsequent messages but testified that the caller was angry and used vulgar language, questioning Chillemi's ethics and claiming that Chillemi was "blocking access to the child."

After hearing from plaintiff and Chillemi, the judge finally heard from defendant. Defendant testified that he was currently living in Nevada and worked as a window tinter and as a specialized installer for certain products. He owns 121 acres of land, located a few hours outside of Las Vegas. The land is mountainous and covered partly by a pine forest, and there are several uninhabited buildings on the property, plus defendant's home.

Defendant testified that his desired outcome for the hearing would be an arrangement that would allow him to "re-establish a connection with [his]

children," and if he retained custody, he would leave everything in Nevada and move to New Jersey to be with them. According to defendant, his relationship with the children has largely deteriorated due to plaintiff's efforts to keep him away from them.

Specifically, defendant identified several instances of he and the children enjoying time together in their earlier years. He explained that when he and the children had spent time together in New Jersey, they went to parks and on crabbing trips, and when they visited him in Nevada, they had friends to play with, and there were plenty of activities, including hiking, horseback riding, visiting parks, and riding quads. However, in recent years, he had limited contact with the children. Specifically, with respect to the daughter, he had only spoken to her over Skype about four times each year during 2017 and 2018. With respect to the son, they had Skyped 130 times during 2017 and forty times during 2018. Defendant specifically identified one of the Skype sessions during which the son told defendant that his stepfather was there for him, and he did not want to speak with defendant on Skype. Defendant stated that this was out of character for his son, and he felt as though his son was being instructed to say these things.

A-0068-18T3

When questioned about plaintiff's testimony concerning certain instances of defendant's failure to consider the children's best interests, defendant always justified his behavior. When asked about the situations where he declined to seek medical care for the children, defendant reasoned that the issues were minor and not worthy of seeking medical attention. Similarly, he explained that the issues plaintiff raised concerning certain individuals being present around the children were exaggerated by plaintiff. With respect to plaintiff's testimony about his unplanned visit to the daughter's school, defendant testified that the daughter's friends, whose mother is friends with defendant's girlfriend, arranged for defendant to visit the school. When he arrived at the school, he spoke with the daughter for a short time and then left without any issue. He reasoned that his daughter was probably upset when plaintiff later arrived at the school because she knew how plaintiff would react to defendant spending time with her.

When asked about Chillemi's plan for him to meet with the daughter, he explained that he had wanted his girlfriend to attend the meeting, as a prior judge had ordered that she be present during parenting time, and he wanted a witness because he was unsure of what would happen at the meeting. With respect to

13

the sixteen voice messages left on Chillemi's cell phone, defendant admitted that he left only the first one, in an effort to confirm the time of the appointment.

At the end of the hearing, the judge issued an oral decision. In evaluating the credibility of the parties, the judge found defendant to be more credible, although he explained that both parties "had trouble answering questions" and directly answering the questions asked. The judge found it "clear . . . that both parties were heavily invested in convincing this [c]ourt that the other side is bad[,] [n]ot worthy of [his] belief." This concerned the judge, causing him to wonder, "[I]f these parties hate each other so much, can they ever work together?" He added that "neither of the parties adequately appreciate how their hatred of each other negatively affects these children." The "constant state of war against each other . . . causes them to act at times without regard to the . . . best interest of the children" and to exaggerate minor situations "beyond all reason." With respect to the children, the judge found that both children conveyed an "unexplained resistance" to spending time with their father, finding "that they have adopted [plaintiff's] viewpoint of . . . defendant."

After evaluating the parties' and the children's testimony, the judge considered each factor set forth at N.J.S.A. 9:2-4(c). Most significantly, he found "that there is no reasonable prospect within the foreseeable future that the

parties will be able to agree, communicate and cooperate, more so on the part of . . . plaintiff than . . . defendant." He also found that "it's clear that . . . plaintiff does not want . . . defendant to see the children," and although defendant had undermined plaintiff's authority on many occasions and may have "said stupid things to the children," the judge did not find "it to rise to the level where the restrictions that have been placed . . . are in any way justified." The judge was equally concerned about plaintiff's efforts to alienate defendant from the children. Specifically, he found that Nevada was no more dangerous than New Jersey, and defendant's marijuana use did not "negatively impact[] his ability to parent." Although the judge found that the children's needs "are more than adequately met by . . . plaintiff[,] . . . for whatever short period of time that the children may be in Nevada, their needs would be met there also."

With respect to the children's preferences, the judge found that the daughter's desire not to spend time with her father in Nevada likely stemmed from her mother's opinions about defendant and the culture in northeast New Jersey. As to the son, the judge found that "he would go to Nevada happily."

Based on his consideration of the statutory factors, the judge concluded that continuing joint custody was the best option:

> Based on the law, it would appear that a joint custodial arrangement is totally inappropriate. Under

normal circumstances, I would say that. However, that being said, even if I said . . . plaintiff was at fault for this, . . . defendant becomes the sole custodian. It's clearly not in the best interest of the children to move to Nevada full time. That being said, however, my concern is if I give . . . plaintiff sole custody, it would be [inimical] to the children's best interest, because it would only lead to a further erosion of the relationship between the children and their father. Consequently, the [c]ourt will continue joint custody as . . . the better of two bad options, to ensure that . . . defendant will have a continuing, and with hope, an improving relationship with the children.

The judge then decided that plaintiff would continue as the parent of primary residence and that unsupervised parenting time for defendant could resume within sixty days, subject to the parties' participation in counseling. He ordered the parties to attend parenting counseling to learn to better interact with each other and to parent their children without undermining each other. He also ordered the children to attend individualized counseling. These decisions were memorialized in a written order that same day. This appeal ensued.

On appeal, plaintiff only challenges the judge's decision to order continued joint legal custody of the children. Plaintiff contends that the judge incorrectly applied his factual findings to the law, given his conclusion that the parties are unable to cooperate in matters related to their children. Further, plaintiff contends that the judge's rationale for ordering joint custody, that

A-0068-18T3

plaintiff alienated defendant from their children, is not supported by the record. In addition, plaintiff argues that the judge erred in declining to allow the guardian to testify and instead read the guardian's report.

Our review of a Family Part judge's factual findings is limited, as we are bound by such findings if they are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Reversal is warranted only if the judge's findings "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Township of North Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)). However, the "judge's findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles." N.J. Div. of Youth & Family Servs. v. Z.P.R., 351 N.J. Super. 427, 434 (App. Div. 2002).

Our Legislature has determined "that it is in the public policy of this State to assure minor children of frequent and continuing contact with both parents

17

after the parents have . . . dissolved their marriage."  N.J.S.A. 9:2-4.  Further,

"it is in the public interest to encourage parents to share the rights and

responsibilities of child rearing in order to effect this policy."  Ibid.  In a

proceeding concerning the custody of a minor child, the judge may award joint

custody, sole custody with a provision for "appropriate parenting time for the

noncustodial parent," or another arrangement that "the court may determine to

be in the best interests of the child."  N.J.S.A. 9:2-4(a) to (c).  When deciding

which option is best for the children, the judge must consider several factors:

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
>
> [N.J.S.A. 9:2-4(c).]

The focus of this inquiry is "the best interests of the child." Ibid.; Sacharow v. Sacharow, 177 N.J. 62, 80 (2003) ("In [custody] cases, the sole benchmark is the best interests of the child."); Fantony v. Fantony, 21 N.J. 525, 536 (1956) ("[T]he paramount consideration is the safety, happiness, physical, mental and moral welfare of the child.").

"[I]n promoting the child's welfare, the court should strain every effort to attain for the child the affection of both parents rather than one." Beck v. Beck, 86 N.J. 480, 485 (1981) (quoting Turney v. Nooney, 5 N.J. Super. 392, 397 (App. Div. 1959)). However, a custody decision "must foster, not hamper," a healthy parent-child relationship. Nufrio v. Nufrio, 341 N.J. Super. 548, 550 (App. Div. 2001). Although joint legal custody may be preferred in certain cases, as it may "foster the best interests of the child," Beck, 86 N.J. at 488, "the decision concerning the type of custody arrangement [is left] to the sound discretion of the . . . courts," Pascale v. Pascale, 140 N.J. 583, 611 (1995).

In Nufrio, we considered whether an award of sole custody was supported by the record. 341 N.J. Super. at 554. The Family Part had entered a pendente lite order for joint legal custody of the parties' child. Id. at 552. "Thereafter ensued a bitter and acrimonious . . . history, marred by frequent applications to the court and several municipal court and domestic violence charges." Ibid.

19                                                          A-0068-18T3

After a trial, the judge found that the defendant "does nothing that is not for his own benefit," and "he cannot perceive how difficult he makes things for other people and does not believe that he has done wrong." Ibid. The judge found the defendant's testimony, that the plaintiff did not look out for their child's best interests, "totally unbelievable." Id. at 553. Thus, the judge granted sole custody to the plaintiff, leaving the defendant with an "extensive parenting-time schedule" as provided in the parties' final judgment of divorce. Ibid. The judge reasoned "that the child's rights will not be protected if joint custody is awarded and continuing conflict between the parties will increase if called upon to make 'together' decisions." Ibid. Further, the plaintiff "can no longer be challenged by [the defendant] in [everything] that she does for their son." Ibid.

We affirmed the Family Part's decision, as the judge's findings made "it clear that any form of 'joint' custody or shared decision-making will be detrimental to the parties' child." Id. at 555. We also identified principles pertaining to the relationship between parents that should guide judges in deciding custody issues:

> [T]he prime criteria for establishing a joint legal custodial relationship between divorced or separated parents centers on the ability of those parents to agree, communicate and cooperate in matters relating to the health, safety and welfare of the child notwithstanding animosity or acrimony they may harbor towards each

20

A-0068-18T3

other. The ability of parents to put aside their personal differences and work together for the best interests of their child is the true measure of a healthy parent-child relationship. A judicial custody determination must foster, not hamper, such a healthy relationship. Therefore, a parent's amenability or inability to cooperate with the other parent are factors to be considered in awarding joint legal custody.

[Id. at 550.]

Having considered the judge's factual findings and his reasons for determining that joint legal custody is "the better of two bad options," we conclude that, under the circumstances, ordering joint legal custody is inconsistent with the legal principles that govern custody matters. We are troubled that the judge concluded that "[b]ased on the law, it would appear that a joint custodial arrangement is totally inappropriate," and yet, he ordered joint legal custody. As the record reveals, and as the judge properly found, there appears to be "no reasonable prospect within the foreseeable future that the parties will be able to agree, communicate and cooperate." In Nufrio, it was this inability to communicate on the part of the parties that we held warranted awarding sole custody to the plaintiff. Id. at 555. Although Nufrio differs in that it involved a defendant who exhibited severely inappropriate behavior, and the record before us does not suggest the same pathological behavior on the part of defendant, the record clearly indicates, however, that requiring the parties to

21

continue making joint decisions would be detrimental to their children. <u>See</u> <u>ibid.</u> Their disagreements over every aspect of raising their children, even concerning seemingly minor events, have negatively impacted their relationships with the children.

Moreover, the judge's finding that plaintiff has alienated defendant from the children is unsupported. Defendant offered no expert testimony about parental alienation and the possibility that it had occurred and negatively impacted the children's views of him. It appears that the judge based this finding on his own assessment of the parties as they testified. Further, such a finding contradicts the judge's own findings that both parties played a role in impairing the relationships with their children. Regardless, the judge's concern that defendant's relationship with the children may further deteriorate can be remediated by ensuring that plaintiff adheres to defendant's parenting time schedule, and defendant continues to comply with the requisite orders about each visit. As the July 26, 2018 order provides, unsupervised parenting time would resume within sixty days of the order.

Accordingly, we reverse the judge's July 26, 2018 order to the extent that it mandates joint legal custody of the parties' children. We remand to the Family Part for entry of an order granting sole legal custody to plaintiff.

Because we conclude that reversal is warranted, we need not address plaintiff's argument concerning the judge's decision not to hear the guardian's testimony but to instead read the guardian's report. To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Reversed and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0068-18T3